UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ADDIA Y. ROMAN JIMENEZ,                                      :

                               Plaintiff,                          :

            - against -                                    :

CAROLYN W. COLVIN,                                          :
Acting Commissioner of Social Security,

                              :

                       Defendant.

------------------------------------------------------------x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 2/13/14 |

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
PAUL G. GARDEPHE**[*]

12 Civ. 6001 (PGG) (FM)

**FRANK MAAS**, United States Magistrate Judge.

          Plaintiff Addia Y. Roman Jimenez ("Roman") brings this action under

Section 405(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of

a final decision of the Commissioner ("Commissioner")[1] of the Social Security

Administration ("SSA") denying her application for Supplemental Security Income

("SSI"). (ECF No. 1). Roman has moved, and the Commissioner has cross-moved, for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

(ECF Nos. 11, 13). For the reasons set forth below, I recommend that the Court deny

Roman's motion and grant the Commissioner's cross-motion.

---

[*]      Ryan Chabot, a student at Columbia Law School, assisted in the preparation of
this Report and Recommendation.

[1]      The complaint in this action named Michael Astrue as the defendant. (ECF No.
1). Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, I have corrected the caption
to reflect the name of the current acting Commissioner.

I.        Background and Procedural History

Roman applied for SSI on September 19, 2008, alleging that her disability began on September 1, 2008.  (Tr. 151).[2]  After the Commissioner denied her application on December 11, she requested an administrative hearing on December 26, 2008.  (Id. at 65, 69, 71-80).  Administrative Law Judge ("ALJ") Cameron Elliot conducted that hearing on March 12, 2010.  (Id. at 30-50).  Roman, the only witness to testify, was questioned by both her attorney and the ALJ.  Thereafter, on April 21, 2010, the ALJ issued a decision determining that Roman "ha[d] not been under a 'disability' within the meaning of [the Act] since September 19, 2008, the date the application was filed."  (Id. at 14).  The ALJ's decision became the Commissioner's final decision on June 5, 2012, when the Appeals Council denied her request for review.  (Id. at 2).

Roman commenced this action on August 6, 2012.  (ECF No. 1).  Roman then moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure on March 22, 2013.  (ECF Nos. 11, 12 ("Pl.'s Mem.")).  On April 23, 2013, the Commissioner opposed Roman's motion and cross-moved for judgment on the pleadings.  (ECF Nos. 13, 14 ("Comm'r's Mem.")).

The issue presented by both motions is whether the ALJ's determination that Roman was not disabled within the meaning of the Act since September 1, 2008, was supported by substantial evidence.

---

[2]        Citations to "Tr." refer to the certified copy of the administrative record filed by the Commissioner with the answer.  (ECF No. 7).

II.    Relevant Facts

    A.    Nonmedical Evidence

Roman's hearing testimony and related exhibits established as follows:

Roman was born in the Dominican Republic on November 19, 1975, and moved to the United States in the early 1990s.  (Tr. 36).  She attended school through the eighth or ninth grade and primarily speaks Spanish.  (Id. at 36, 177, 242, 263).  She lives with her three children and their father in a fifth-floor walk-up apartment in the Bronx. (Id. at 35).  Roman's longest past employment was as a sidewalk solicitor for a telephone company for a year in the late 1990s.  (Id. at 36-38).  She also held other jobs briefly.  (Id. at 48, 179).

Roman alleges that she became unable to work on September 1, 2008, due to asthma and depression.  (Id. at 38-40, 178).  She reports that walking up the stairs to her apartment fatigues her because of her asthma.  (Id. at 35).  Roman treats the condition with a nebulizer, which she uses every six hours as necessary, but not every day.  (Id. at 38).  She also uses a Symbicort aerosol pump twice daily to prevent asthma attacks.  (Id. at 39, 297).  She has never been hospitalized for this condition.  (Id. at 48, 232).

At the time of her hearing, Roman had suffered from depression for three years.  (Id. at 40).  She had been hospitalized for depression twice, first in 2007 at Bronx Lebanon Hospital Center, and again in 2008 at Jacobi Medical Center.  (Id. at 41, 242, 334).

Roman testified that she cooked for herself, went to food banks at churches, and visited her sister on weekends.  (Id. at 42-44).  She generally took public transportation to her sister's home with the assistance of a homemaker provided by the City of New York, but at times would attempt to do so on her own.  When unassisted, she would become confused and miss her stop.  (Id. at 43).  At the time of her hearing, Roman was enrolled in a GED program.  (Id. at 42-43).  Roman's children had been taken into the custody of the New York City Administration for Children's Services following an allegation that Roman had neglected them by failing to take them to school; her children subsequently were returned with the proviso that Roman was not to be alone with them.  (Id. at 45-47).

B.      Medical Evidence Regarding Asthma

1.      Dr. Alcedo A. Cruz

Dr. Alcedo A. Cruz, a board-certified internist, first examined Roman on December 5, 2007 and observed mild intermittent bronchial asthma.  (Id. at 301, 325; Comm'r's Mem. at 3).  He saw Roman again on March 18, 2008 and found that her lungs were "clear to auscultation bilaterally" with "no wheezes/rhonchi/rales."  (Tr. 297).  He diagnosed her with mild persistent bronchial asthma and prescribed Symbicort aerosol and albuterol as needed.  (Id. at 282, 297).  Additionally, he recommended that she live in a first-floor or elevator-accessible apartment.  (Id. at 282).  When Dr. Cruz again examined Roman on July 28, 2008, her lungs remained clear with no

wheezes/rhonchi/rales.  (Id. at 298).  He prescribed continued Symbicort and ordered

laboratory tests.  (Id. at 298-99).  Roman reported "feeling much better."  (Id.).

On August 4, 2008, Dr. Cruz informed Roman that the laboratory tests

showed "mildly elevated triglycerides," for which he recommended exercise and a

low-fat, low-calorie diet.  (Id.).  He observed no change in Roman's lungs.  (Id.).  Roman

reported "no current complaints," and Dr. Cruz described her as a "healthy adult."  (Id. at

300, 315).

Dr. Cruz filled out a New York City Medical Request for Home Care form

for Roman on November 12, 2009.  (Id. at 476).  He listed her primary diagnosis as

asthma and her secondary diagnosis as anxiety disorder.  (Id.).  He indicated, however,

that Roman had no sensory, muscular/motor, or cardiovascular/respiratory impairments.

(Id. at 477).  He further observed that Roman was always alert and did not exhibit

disorientation to place or time, anxiety, agitation, short-term memory impairment,

wandering, depression, impaired judgment, danger to others, danger to self,

communication problems, sleep disorders, or abusive behavior.  (Id.).  Although he

indicated that Roman required home care for chores – specifically, cleaning, laundry, and

meal preparation – he noted that she could ambulate inside and outside and could get up

from a seated position and from a bed.  (Id. at 478).

2.    Dr. Catherine Pelczar-Wissner

At the request of the state agency, Dr. Catherine Pelczar-Wissner, a

board-certified internist, examined Roman on December 2, 2008.  (See id. at 232; Pl's

5

Mem. at 7).  In her report, Dr. Pelczar-Wissner stated that Roman "cooks, cleans, does laundry, and shop[s] every day.  She showers, bathes, and dresses.  She watches TV and socializes with friends."  (Id.).  A chest and lung examination revealed "[n]ormal AP diameter," "[p]ercussion normal," "[n]o significant chest wall abnormality," and "[n]ormal diaphragmatic motion," but "mild inspiratory and expiratory wheezing."  (Id. at 233).  A pulmonary function test revealed "[m]ild obstruction and some small airways disease."  (Id. at 234).  Dr. Pelczar-Wissner diagnosed Roman with asthma and depression, but indicated that her prognosis was "[s]table."  (Id.).  She recommended that Roman "avoid smoke, dust, and known respiratory irritants."  (Id.).

>    B.    Medical Evidence Regarding Depression

Roman has seen a number of mental health professionals for her depression: Dr. Francisco Rodriguez, a psychiatrist, and Gilbert Calcano, a licensed clinical social worker, at the Oasis Guidance Center; and Dr. Herb Meadow, who examined her in a consultative capacity for the Administration.  Additionally, Roman has been hospitalized twice for depression:  first at Bronx Lebanon Hospital Center in August 2007, and again at the Jacobi Medical Center in December 2008.

>    1.    Bronx Lebanon Hospital Center

Emergency Medical Services took Roman to the emergency room at Bronx Lebanon Hospital Center ("BLHC") on August 14, 2007, after she grabbed a knife with the intent to kill herself and scratched her left arm.  (Id. at 242, 249).  She presented with a depressed mood, constricted affect, and soft speech, and reported "periods of sad mood,

lack of energy, loss of appetite, poor concentration and poor sleep."  (Id. at 242, 249).

She also reported having occasional auditory hallucinations "telling her to kill herself,"

and worried that "people were talking about her, laughing at her."  (Id. at 242, 249).

Roman was discharged from BLHC two days later.  (Id. at 242-43).  During

her treatment, she was "calm and cooperative" and expressed "no behavioral

disturbance."  (Id.).  She was prescribed Risperdal, an antipsychotic medication, and

Lexapro, an antidepressant.  (Id.).  With this treatment, Roman's mood "improved greatly

and her psychotic symptoms resolved."  (Id.).  She was diagnosed with "[m]ajor

depressive disorder with psychotic features," "panic disorder," and "depression/suicidal

ideations," and was assigned a Global Assessment Functioning (GAF) score of 50.[3]  (Id.

at 242, 248).  At the time of discharge, her "[a]ffect was still mildly constricted," her

"[m]ood was better" and "[s]he was coherent[,] alert and oriented."  (Id. at 242-43).

Roman "denied any suicidal or homicidal ideation or plan."  (Id. at 243).

---

[3]      Until the publication of the DSM-5 in 2013, the GAF scale was used to rate a
patient's social, occupational, and psychological functioning without regard to physical
impairments.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders
34 (4th ed., text revision, 2000) ("DSM-IV-TR"); Am. Psychiatric Ass'n, Diagonistc and
Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-5") (discussing reasons for
recommending that GAF scale be dropped).  A score in the range of 41-50 reflected "[s]erious
symptoms" such as suicidal ideation, or "any serious impairment in social, occupational, or
school functioning," such as having no friends.  DSM-IV-TR at 34.  A score of 50 reflected the
lowest level of impairment within the "serious" range.  Id.

2.       Dr. Maria Cristina

On August 23, 2007, Roman met with Dr. Maria Cristina, a psychotherapist at the Oasis Guidance Center.  (Id. at 259, 268).  Roman indicated that she previously had been employed as a "customer representative" and had "enjoy[ed] working and talking to people."  (Id. at 263).  She also indicated a desire to return to school or obtain a GED and requested a referral for "[v]ocational and/or [e]ducational services."  (Id.).  Dr. Cristina indicated that Roman needed to improve in the functional areas of "[m]anaging sadness, depression, lack of interest," "[c]ommunication skills, including assertiveness," and "[s]elf-awareness of values and preferences."  (Id. at 267).  Dr. Cristina diagnosed Roman with Depressive Disorder, and assigned her a GAF score of 40.[4]  (Id. at 268).

3.       Dr. Francisco Rodriguez

On September 4, 2007, Dr. Rodriguez conducted an initial psychiatric evaluation of Roman at the Oasis Guidance Center.  (Id. at 255).  During this session, Roman reported that she had been feeling depressed, had crying spells, was unable to sleep, and had suicidal ideation.  (Id.).  She reported hearing voices that told her to "get out of the way."  (Id.).  Dr. Rodriguez characterized her attitude as cooperative, but her mood as depressed.  (Id. at 256).  She denied any current suicidal or homicidal thoughts.  (Id. at 257).  Dr. Rodriguez's diagnosis on Axis I was major depressive disorder,

---

[4]       A GAF score of 40 reflects "[s]ome impairment in reality testing or communication" or "major impairment in several areas," including "family relations, judgment, thinking, or mood."  DSM-IV-TR at 34.

recurrent, severe with psychotic features, rule out panic disorder, and on Axis II was borderline personality disorder.  (Id. at 258).

From September 2007 to December 2009, Dr. Rodriguez met with Roman approximately once a month.  His reports indicate periodic fluctuations in mood without great improvement or deterioration.  (See id. at 271-81, 415, 418-19, 423, 428, 436, 440, 446, 453, 457, 461, 467-69).

On July 1, 2008, Dr. Rodriguez completed a Medical Request for Home Care in which he diagnosed Roman with major depressive disorder, recurrent, severe with psychotic features.  The doctor indicated that this was a chronic condition, and that further diagnostics would need to rule out panic disorder.  (Id. at 289-92).  He noted that he was treating Roman with Citalopram, an antidepressant, Ambien, a sleeping medication, and Risperdal.  (Id.).  He reported no physical impairments, but noted that Roman sometimes exhibited anxiety, short-term memory impairment, depression, and sleep disorder.  (Id. at 290).  He stated that Roman "becomes depressed [and] anxious with insomnia and [demonstrates] occasional low concentration [and] memory problems when . . . under stress, yet respond[s] to medication and psychotherapy."  (Id.).  He also noted that Roman could ambulate inside and outside and get up from a seated position and from bed.  (Id. at 291).  He did not request any specific services.  (Id.).

On October 27, 2009, Dr. Rodriguez completed a "Psychiatric/Psychological Impairment Questionnaire" ("Questionnaire") at the request of

Roman's counsel.  (Id. at 340-47).  In the Questionnaire, Dr. Rodriguez diagnosed Roman as suffering from major depressive disorder, borderline personality disorder, asthma, and psychosocial and environmental problems.  (Id. at 340).  He assigned her a GAF score of 50 and described her prognosis as poor to fair.  (Id.)  He identified her more serious symptoms as frequent depressive features and severe suicidal ideation.  (Id. at 342).  He indicated that Roman was "markedly limited" in her ability to "remember locations and work-like procedures," "understand and remember one or two step instructions," "understand and remember detailed instructions," and "work in coordination with or proximity to others without being distracted by them."  (Id. at 343).  He indicated that Roman experienced "episodes of deterioration or decompensation in work or work like settings which cause[d her] to withdraw from that situation and/or experience exacerbation of signs [or] symptoms."  (Id. at 345).  He further indicated that he expected Roman's impairments to last at least twelve months, and that they would cause her to be absent from work more than three times each month.  (Id. at 346-47).

Dr. Rodriguez also met with Roman on the date that he completed the Questionnaire.  His progress notes state that the "issues related to [Roman's] children seem to be getting better which make[s] her feel better, more motivated."  (Id. at 428).  He also noted improvement in Roman's sleep and appetite.  (Id.).  He described Roman as "[c]alm, pleasant[,] cooperative[,] . . . [c]oherent and goal directed." (Id.).  He stated that

Roman denied homicidal, suicidal and hallucinatory ideas and presented "[n]o evidence of psychosis."  (Id.).

   At their final meeting in 2009, Dr. Rodriguez again observed that Roman's sleep and appetite were "good," and he described her as "[c]alm, pleasant and cooperative," and having "[n]o psychosis."  (Id. at 418).  She again denied homicidal, suicidal and hallucinatory ideation.  (Id.).

   4. Dr. Herb Meadow

   Dr. Herb Meadow, a consultative psychiatrist, evaluated Roman on December 2, 2008.  (Id. at 208-11).  Dr. Meadow described her eating and sleeping patterns as "normal" and her weight as "stable."  (Id. at 208).  Roman told Dr. Meadow that "she was depressed in the past, but that the medicine ha[d] helped alleviate the depression; although, she still occasionally ha[d] dysphoric moods with irritability and low energy and at times difficulty concentrating."  (Id.).  She further indicated that she "had suicidal thoughts in the past, but not at this time."  (Id.)  She reported suffering from anxiety, including experiencing panic attacks when under stress.  (Id.).  Dr. Meadow described her thought process as "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia," her affect as "[a]ppropriate," and her mood as "[d]epressed."  (Id. at 209).  He also described her attention and concentration as "[i]mpaired due to limited intellect" and her cognitive functioning as "[b]elow average," noting that she "could count, but not add or subtract single digit numbers."  (Id.).  He

11

reported that, "[a]t home, she takes care of her personal hygiene, does all the household chores, and socializes with friends and family.  She spends her days at home, watching TV, and taking care of her children."  (Id. at 210).  Dr. Meadow wrote that her condition "does not appear to be significant enough to interfere with [her] ability to function on a daily basis."  (Id.).  He recommended that Roman continue with psychiatric treatment and described her prognosis as "[f]air."  (Id.).

> 5.    Jacobi Medical Center

Roman was treated at the emergency room of Jacobi Medical Center on December 9 and 10, 2008, following an apparent overdose of Ambien.  (Id. at 334).  Roman stated that she missed her daughter.  (Id.).  The Jacobi staff noted that Roman improved after talking about the "situation" with her other children and that she would "benefit from more frequent individual therapy."  (Id.).

> 6.    Gilbert Calcano

Gilbert Calcano, a licensed social worker at the Oasis Guidance Center, met with Roman periodically from at least December 8, 2008 through the end of 2009.  (Id. at 372-475).  During this period, he completed Progress Notes after each meeting and a Treatment Plan Review ("TPR") every three months.  (Id. at 372-413, 417-75).  Throughout the TPRs, Calcano diagnosed Roman with asthma, major depressive disorder, borderline personality disorder, and other problems.  (Id.).  Like Dr. Rodriguez and the

BLHC staff before him, Calcano consistently assigned Roman a GAF score of 50.  (See, e.g., id. at 372, 379, 386).

The TPRs reveal that, throughout her treatment with Calcano, Roman worked through issues related to her loss of custody of her oldest daughter and her conflicts with her husband and with her home aides.  (Id.).  Further, each TPR showed partial achievement of some of Calcano's goals.  (See, e.g., id. at 373, 387-88, 402-03, 409-10).

On December 8, 2008, Calcano indicated that Roman "display[ed] depressive features" and was "tearful."  (Id. at 475).  Indeed, her anxiety had caused "itching that . . . left whelps [sic] on her legs and arms."  (Id.).  On this and other occasions, Roman denied that her overdose was a suicide attempt.  (See id. at 466, 470-71, 474).  During a session on December 13, she explained "that she was tired, confused[,] discontented," and "could not sleep," and therefore "took four Respidal [sic] which Dr. Rodriguez had suspended."  (Id. at 474).[5]

With these exceptions, Calcano generally observed improvements.  He almost uniformly described Roman as "well oriented" with "fair" "insight and judgment," and as denying "any suicidal or homicidal ideations" or "hallucinations or delusions."

---

[5]     That same day, a state agency psychological consultant, named L. Meade, checked four boxes on a "Psychiatric Review Technique" form to indicate that Roman had "Impairment(s) Not Severe" in the categories of "Organic Mental Disorders," "Affective Disorder," and "Anxiety-Related Disorders."  (Id. at 212).  Meade provided no explanation for these conclusions, and neither Roman nor the Commissioner discusses them in their motion papers.

(See id. at 417, 420-21, 424-26, 429, 431-32, 434, 437, 439, 442-44, 449, 451-52, 454-55, 458-59, 462-63, 465-66, 470-71, 474-75). He noted that even when Roman experienced marital difficulties and conflicts with her home-care workers, her mental health steadily improved. (See id. at 452, 463). As early as December 17, 2008, Calcano noted that Roman appeared "to be doing better and state[d] that she is." (Id. at 471). Thereafter, his progress notes indicate continued improvement. (See id. at 470 ("feeling much better"), 462 ("appears less depressed"), 455 ("over all [sic] [Roman] is progressing well and reporting less depressive symptoms"), 444 ("reporting a significant decrease in her depressive features"), 434 ("less depressed")). On November 2, 2009, Calcano wrote that "[i]t is evident that [Roman's] depression has lifted significantly, she smiled through out [sic] the session and expressed lifted spirits." (Id. at 426). He continued to describe the improvement two weeks later, saying that Roman "reports a significant decrease in her depression and depressive features. . . . [Her] appearance has improved, [and] she doesn't have the flat affect that she had some time ago. She appears more energetic and content as opposed to depressed." (Id. at 424). By December 2009, Calcano noted that Roman displayed "pride and joy" at joining a GED program, that "things at home [were] going fine," and that she "interacted well" and "demonstrated good socialization[] skills" at the Oasis Guidance Center holiday party. (Id. at 420, 417).

14

C.   ALJ Decision

In his decision dated April 21, 2010, ALJ Elliot concluded that Roman was not disabled within the meaning of the Act since September 19, 2008, when she applied for SSI.  (Id. at 14).  The ALJ applied the five-step sequential analysis required by 20 C.F.R. § 416.920 to reach this determination.

At Step One, the ALJ found that Roman "ha[d] not engaged in substantial gainful activity since September 19, 2008, the application date."  (Id. at 16).

At Step Two, he concluded that Roman "has the following severe impairments:  asthma, major depressive disorder, panic disorder, borderline personality disorder, and cognitive disorder."  (Id.).

At Step Three, the ALJ found that Roman did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").  (Id.).  The ALJ determined that Roman's asthma was not sufficiently severe to satisfy the requirements of Listing 3.03 because she had never been hospitalized or gone to the emergency room for the condition.  (Id.).  He further found that Roman's depression caused only mild restriction in activities of daily living, although she had moderate difficulties in social functioning and marked difficulties in concentration, persistence, or pace.  (Id. at 17).  He determined that she had experienced "one to two episodes of decompensation, each of extended duration," but did not satisfy the Paragraph B criteria in listings 12.03, 12.04,

12.06 and 12.08 because her impairments did not "cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."  (Id.).  Similarly, her impairments did not satisfy the Paragraph C criteria because Roman had no history of repeated decompensation, nor was there a likelihood of future decompensation.  Further, she did not live or need to live in a "highly structured environment," and could "function outside her own home."  (Id.).

At Step Four, the ALJ determined that Roman had the residual functional capacity (RFC) "to perform light work as defined in 20 CFR § 416.967(b)."  (Id. at 18). He found that this capacity was limited, however, to unskilled work "involving no climbing and no concentrated exposure to extreme cold, extreme heat, wetness, humidity, or fumes, gases, dust, odors, and other pulmonary irritants."  (Id.).  The ALJ considered "carefully" the entire record, including "all symptoms" and their consistency "with the objective medical evidence," as well as "opinion evidence."  (Id.).  In doing so, he followed a two-step process, determining first "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce [Roman's] pain or other symptoms," and then "evaluat[ing] the intensity, persistence, and limiting effects of [Roman's] symptoms to determine the extent to which they limit [her] functioning."  (Id.).

ALJ Elliot found that Roman did, indeed, suffer from "medically determinable impairments [that] limit her exertionally, environmentally, and mentally."

(Id. at 21).  However, the ALJ concluded that the record as a whole demonstrated that Roman was able to perform "a wide range of unskilled work with light exertional demands" despite these impairments.  (Id.).  He noted that "[o]verall, the reports from Mr. Calcano and Dr. Rodriguez suggest that the claimant made steady progress concerning her mental health," and that the progress reports of both professionals painted a "generally rosy picture."  (Id. at 22).

The ALJ also considered the evidence contrary to this "rosy picture," which he identified as Dr. Rodriguez's Psychiatric Impairment Questionnaire from October 27, 2009 and Roman's own hearing testimony.  (Id.).  The ALJ gave "little weight" to Dr. Rodriguez's Questionnaire responses because they were "neither not consistent with nor supported by his own treatment records," and were inconsistent with Roman's "own statements to Dr. Rodriguez and Mr. Calcano" and their observations of her behavior, the progress reports, and the "consultative mental status examination."  (Id.).  Therefore, although the ALJ partly adopted Dr. Rodriguez's assessed limitations in his Step Three analysis, due to these inconsistencies he gave little weight to the Questionnaire at Step Four.  (Id.).

The ALJ also found that Roman's own testimony, allegations, and statements were "not fully credible" to the extent that they were inconsistent with his RFC finding.  (Id.).  Indeed, the ALJ stated that Roman's lack of a significant work history, even before the onset of her alleged disability, was suggestive of "a lack of

motivation to work."  (Id.).  He also noted that there were inconsistencies in the way

Roman described her work history, in that she claimed to one examiner that she had never

worked, yet stated "misleadingly" on her SSA Work History form that she had been

employed as a telemarketer.  (Id.).  He further noted with respect to Roman's respiratory

problems that she took no asthma medication at the time of her application, that her

pulmonary function test "revealed obstructive pulmonary disease so 'mild' . . . that she

was not even tested with bronchodilators," and that she had never been hospitalized for

her asthma.  (Id. at 22-23).  He also observed that there was "reason to be skeptical" about

Roman's explanations as to why she was provided with a home aide.  (Id. at 23).  Finally,

he noted that Roman initially testified that she could not work because her oldest child

has cerebral palsy and required care, yet later she claimed that her own impairments

prevented her from working.  (Id.).

   The ALJ also considered and evaluated the opinion evidence.  As discussed

previously, he gave little weight to Dr. Rodriguez's opinion in the October 2009

Questionnaire.  He also disregarded the assessment of evaluator Meade, who found that

Roman had "no severe mental impairment," and credited instead the opinions of Dr.

Meadow and Calcano, who concluded that Roman had a severe mental impairment.  (Id.).

He gave controlling weight to Dr. Cruz's opinion that Roman should live on the first

floor, construing this as giving rise to "a limitation to light exertion with no climbing."

(Id.).  He gave "little weight," however to Dr. Cruz's statement in the "Medical Request

for Home Care" indicating that Roman needed an aide "to help with cleaning, laundry, and cooking" because of her asthma, citing contrary statements by Roman (that she was independent in activities of daily living) and by Dr. Cruz himself (indicating on the same form that Roman showed no signs of respiratory impairment).  (Id.).  Finally, the ALJ credited and adopted Dr. Pelczar-Wissner's opinion that Roman should avoid respiratory irritants, which was shared by the State's consulting physician.  (Id. at 24).

Based on his findings, the ALJ concluded that Roman was capable of performing her past relevant work as a sidewalk solicitor for a telephone company, which did not require that she engage in any activities precluded by her RFC.  (Id.).  As the ALJ noted, this past work is similar to the job of "Solicitor or Canvasser," also known as "Sales Representative, Door-to-Door."  Citing the Dictionary of Occupational Titles, ("DOT"), the ALJ noted that this position is "light and unskilled and requires no climbing or exposure to fumes, dust, gases, odors, or other pulmonary irritants."  (Id.).

Although the finding that Roman had the RFC to perform her past relevant work was sufficient to end the inquiry, the ALJ went on to consider, at Step Five, whether Roman also could perform other jobs existing in significant numbers in the national economy.  (Id.).  Taking into account her RFC, as well as her "age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2," the ALJ determined that she could work as an "[a]ssembler,

19

electrical accessories," a "[r]outing clerk," or a "[s]ilver wrapper,"[6] work that could be accomplished despite her restrictions.  (Id. at 24-25).  The ALJ therefore concluded that Roman's limitations did "not reduce the number of light and sedentary occupations available to [her] to any significant degree," rendering her not disabled under the Act. (Id. at 25).

III.   Discussion

    A.   Standard of Review

       Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M. C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

       The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  "Substantial" evidence need not be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a

---

    [6]   The DOT explains that a silver wrapper in a hotel or restaurant "[s]preads silverware on absorbent cloth to remove moisture," "[w]raps individual place settings" or heat seals them together with condiments in plastic bags, or may immerse tarnished silverware in cleaning solution.  See U.S. Dep't of Labor, DOT, Code 318.687-018, available at www.occupationalinfo.org.

reasonable mind might accept as adequate to support a conclusion." Richardson v.

Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197,

229 (1938)).

       A district court may not review the Commissioner's decision de novo.

Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d

496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Rather, the

court may only ensure that the Commissioner applied the correct legal standard and that

substantial evidence supports the decision.  See Hickson v. Astrue, No. CV-09-2049

(DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011).  When substantial

evidence supports the Commissioner's determination, the court must uphold it, "even if

there also is substantial evidence for the plaintiff's position."  Morillo v. Apfel, 150 F.

Supp. 2d 540, 545 (S.D.N.Y. 2001).

     B.   Treating Physician Rule

       The "so-called 'treating physician rule,' . . . requires the ALJ to grant

controlling weight to the opinion of a claimant's treating physician if the opinion is well

supported by medical findings and is not inconsistent with other substantial evidence."

Rosado v. Barnhart, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2)).  The Commissioner, however, need not grant

"controlling weight" to a treating physician's opinion as to the ultimate issue of disability;

the Commissioner alone makes that determination.  See 20 C.F.R. § 404.1527(d)(1); Snell

v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("treating physician's statement that the claimant is disabled cannot itself be determinative").   Nevertheless, the Commissioner must provide "good reasons" for the weight given to a treating source's opinion, even when that opinion goes to disability.   20 C.F.R. § 404.1527(c)(2); Snell, 177 F.3d at 133-34 (citing Schaal, 134 F.3d at 505).   If the ALJ failed to apply the correct standard to the treating physician's opinion or to give good reasons for rejecting such opinion, the reviewing court will remand.   Halloran, 362 F.3d at 33; Schaal, 134 F.3d at 505-06).

Roman argues that the ALJ inappropriately gave "little weight" to the opinions of Dr. Rodriguez, her treating psychiatrist, whose views should instead have been afforded controlling weight.   (Pl.'s Mem. at 10-11).   The ALJ did not totally disregard Dr. Rodriguez's opinions, choosing to give them "controlling weight" with regard to the domain of "concentration, persistence, or pace."   (Tr. 17; see also id. at 22) (noting that ALJ gave Dr. Rodriguez "the benefit of the doubt" with respect to certain findings regarding Roman's "'B' criteria" at Step Three.   Nevertheless, the ALJ gave Dr. Rodriguez's Questionnaire responses little weight at Step Four because he observed that they stood "[i]n sharp contrast to the generally rosy picture painted by the progress reports from Dr. Rodriguez and Mr. Calcano."   (Id. at 22).

Substantial evidence supports this determination.   As the ALJ explained, the opinions expressed in the Questionnaire are contradicted by other professionals' reports and "are neither consistent with nor supported by [Dr. Rodriguez's] own treatment

records." (Id.).  For example, the Questionnaire responses cite Roman's "severe suicidal ideations."  (Id. at 343).  The very same day, however, Dr. Rodriguez's progress notes state that Roman "[d]enies H/S/H [homicidal/suicidal/hallucinatory] ideas."  (Id. at 428). Similarly, in the Questionnaire, Dr. Rodriguez calls Roman's prognosis "poor," while his notes describe her as "[c]alm, pleasant[,] cooperative[,] . . . [c]oherent and goal directed," and having fair insight and judgment.  (Id. at 343, 428).  Thus, the ALJ did not reject Dr. Rodriguez's opinions; only his oddly contradicting Questionnaire.

Dr. Rodriguez's Questionnaire is further contradicted by the findings of Dr. Meadow as well as Calcano's extensive notes and treatment reports.  Dr. Meadow found some limitations, but none "significant enough to interfere with [Roman's] ability to function on a daily basis."  (Id. at 210).  Calcano's documents, which cover the period from at least December 8 through December 2009, consistently reflect that Roman denied having any suicidal thoughts, (id. at 372-475), notwithstanding Dr. Rodriguez's notation on the Questionnaire on October 27, 2009, that Roman had "suicidal ideation or attempts," (id. at 341-42).  Calcano's reports also show steady improvement, contradicting the Questionnaire's "poor" prognosis.  (See id. at 372-475, 340).  For example, on October 27, 2009, the very date that Dr. Rodriguez suggested that Roman was suffering from episodes of deterioration or decompensation due to her children having been placed in foster care, (id. at 345), Calcano wrote:

> Reported issues related to her children seem to be getting better which make[s] her feel better, more motivated. Sleeping and appetite appear improved.
>
> . . . Calm, pleasant and cooperative. . . . Coherent and goal directed.  Denies H/S/H ideas.  No evidence of psychosis. Insight and judgment appear fair at this time.

(Id. at 428).

The Act requires the ALJ to explain why he chose to discredit a certain opinion, and the ALJ did so here.  (Tr. 22).  As this comparison shows, his determination that Dr. Rodriguez's Questionnaire should be afforded little weight was supported by substantial evidence.  ALJ Elliot therefore did not violate the treating physician rule.

C.      Disability Determination

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A).  Whether a claimant is disabled or unable to work is a matter reserved for the Commissioner. 20 C.F.R. § 404.1527(e).  In determining whether a claimant is disabled, the Act requires the Commissioner to apply the five-step sequential process outlined in 20 C.F.R. §§ 404.1520 and 416.920.  The Second Circuit describes that process as:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or

24

mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The claimant bears the burden of proof for the first four steps of the five-step process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (quoting Berry, 675 F.2d at 467).  If the Commissioner finds that a claimant is disabled (or not disabled) at an early step in the process, she is not required to proceed with any further analysis.  20 C.F.R. § 404.1520(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).

To determine if a claimant is disabled, the Commissioner considers factors including:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).  Although the Act requires the ALJ to follow the five-step sequential analysis and consider the above factors in making the

disability determination, he need not state his reasoning for each step of the analysis explicitly.  "[T]he absence of an express rationale for an ALJ's conclusions does not prevent [a court] from upholding them so long as [the court is] 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'"  Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (quoting Berry, 675 F.2d at 469).

IV.     Analysis

            Roman argues that substantial evidence does not support the ALJ's assessment of her RFC.  (Pl.'s Mem. at 9-14, 17-19).  She also argues that the ALJ failed to credit her testimony properly.  (Id. at 14-17).  The Commissioner contests these claims and argues that substantial evidence supports the ALJ's determination.  (Comm'r's Mem. at 15).  Applying the five-step framework to this case, it is clear that the ALJ's findings were supported by substantial evidence.

      A.    First Step

            At the First Step, an ALJ considers whether the claimant engaged in substantial gainful activity during the period at issue.  See 20 C.F.R. § 416.920(a)(4)(i). Finding in Roman's favor, the ALJ determined that she had not.  (Tr. 16).  The evidence supports this finding.  In an SSI claim, benefits may not be awarded for the period before the claim is filed.  20 C.F.R. § 416.335.  Here, Roman applied for benefits for the period beginning September 1, 2008, and testified that she had not had substantial employment

since her work as a sidewalk solicitor in the late 1990s.  (Id. at 37-38).  That evidence is uncontradicted.

B.      Second Step

At the Second Step, the ALJ assesses the medical severity of the claimant's impairments.  See 20 C.F.R. § 416.920(a)(4)(ii).  If an impairment significantly limits a claimant's physical or mental ability to perform basic work activities, regardless of the claimant's age, education, or work experience, then it is severe.  20 C.F.R. § 416.920(c). At this step, the ALJ found in Roman's favor, determining that she suffered from severe impairments in the form of asthma, major depressive disorder, panic disorder, borderline personality disorder, and cognitive disorder.  (Tr. 16).  This, too, appears undisputed.

C.      Third Step

At the Third Step, the ALJ considers whether the claimant had an impairment or a combination of impairments that met or medically equalled one of those listed in Appendix 1 ("the Listings").  20 C.F.R. § 416.920(a)(4)(iii).  The Act requires that this determination be based solely on medical evidence, not on the claimant's age, education, or work experience.  20 C.F.R. § 416.920(d).  The ALJ considered whether Roman met the Listings for asthma (Appendix 1 § 3.03); schizophrenia, paranoia, and other psychotic disorders (§ 12.03); affective disorders (§ 12.04); anxiety-related disorders (§ 12.06); or personality disorders (§ 12.08).  (Tr. 16).  Under the Section 12 listings, mental impairments constitute disabilities if they meet the criteria set out in both

paragraphs A and B.  See Appendix 1 §§ 12.03, 12.04, 12.06, 12.08.  Sections 12.03 and 12.04 may also be satisfied by paragraph C criteria alone.  Finally, section 12.06 may be satisfied by meeting criteria in paragraphs A and C.  Id.

The ALJ determined that Roman's impairments did not meet or medically equal any of the listed impairments.  (Tr. 16-17).  Roman does not appear to dispute this finding.  Moreover, a review of the evidence and comparison with the Listings confirms that Roman's impairments do not meet the relevant Appendix 1 criteria.  The ALJ therefore properly continued to the Fourth Step.

D.    Fourth Step

At Step Four, the ALJ determines whether the claimant's impairments prevent her from doing her past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv); 416.960(b)(2).  In making this determination, the ALJ must assess the claimant's residual functional capacity, or what the claimant can do despite any impairments, considering relevant medical and other evidence.  Id. §§ 404.1545(a)(1), (3).  If the claimant can still perform her past work, she is not disabled.  Id. § 416.920(a)(4)(iv).

The ALJ found that Roman had the RFC to perform light unskilled work involving no climbing and no concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, gases, dust, odors, and other pulmonary irritants.  (Tr. 18).  Based on this determination, he further found that Roman could perform her past work as

a sidewalk solicitor, which "does not require the performance of work related activities precluded by [her] residual functional capacity." (Id. at 24).

Roman argues that substantial evidence does not support these findings, that the ALJ improperly compared her capabilities to the DOT, and that he evaluated her credibility improperly in the course of assessing her RFC. (Pl.'s Mem. at 9-19).

### 1.   Roman's RFC

Roman first contends that ALJ Elliot's RFC finding is not supported by substantial evidence and conflicts with his determination of her limitations at Step Three. (Pl.'s Mem. at 13). As to the first of these claims, Roman maintains that "[i]n discussing Ms. Roman's RFC, the ALJ did not cite to any medical opinions or other substantial evidence that shows she can perform a full range of unskilled work." (Pl.'s Mem. at 12). This is simply incorrect. As an initial matter, the ALJ did not determine that Roman can perform "a full range" of unskilled work. Rather, he found "that the claimant has the residual functional capacity to perform light work . . . except she is limited to unskilled work involving no climbing and no concentrated exposure to extreme cold, extreme heat, wetness, humidity, or fumes, gases, dust, odors, and other pulmonary irritants." (Tr. 18) (emphasis added).

These limitations are drawn directly from medical opinions in the record. The ALJ construed Dr. Meadow's opinion that Roman "had psychiatric and cognitive problems which were not significant enough to interfere with her ability to function on a

29

daily basis" as a "limitation to unskilled work."  (Id.).  He further adopted Dr. Cruz's opinion that Roman should live on a first-floor or elevator-accessible apartment and construed it as a "limitation to light exertion with no climbing."  (Id.).  He also considered and adopted Dr. Pelczar-Wissner's opinion that Roman should avoid smoke, dust, and other respiratory irritants.  (Id. at 23-24).

As noted previously, both Dr. Rodriguez and Calcano noted continual improvement with treatment throughout their time with Roman.  Over the course of his sessions with her, Dr. Rodriguez noted that Roman's concentration and memory were "fair," that she showed no signs of psychosis, that she was "coherent and goal oriented," and that she displayed "appropriate affect."  (Id. at 423, 428, 436, 440).  Calcano made similar findings.  (See, e.g., id. at 420-21, 424-26, 442-44, 449, 470-71).  Dr. Meadow concluded that, although Roman experienced psychiatric and cognitive problems, they did "not appear to be significant enough to interfere with [Roman's] ability to function on a daily basis."  (Tr. 210).   All of this evidence is consistent with an individual who could perform unskilled work.  Although there is, to be sure, some evidence in the record to the contrary, the ALJ's determination is adequately supported.  See Morillo, 150 F. Supp. 2d at 545 ("If the court finds that there is substantial evidence supporting the Commissioner's decision, that decision must be upheld, even if there also is substantial evidence for the plaintiff's position.") (citing Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Roman further objects that the RFC finding conflicts with the ALJ's determination at Step Three that she has "marked limitation in concentration, persistence, and pace" and "moderate difficulties" in social functioning.  (Pl.'s Mem. at 13 (citing Tr. 17)).  Determinations at Step Three, however, are different than those at Step Four.  SSR 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996).  As the ALJ noted, limitations identified at Step Three "are not [an RFC] assessment . . . .  The mental [RFC] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions."  (Id. at 17-18 (citing SSR 96-8P)).  In other words, identifying an impairment at Step Three – even a marked impairment – does not define the scope of residual functional capacity.  See, e.g., Anderson v. Colvin, No. 12-1102, 2013 WL 1339379, at *6 (10th Cir. Apr. 4, 2013) ("the ALJ was not required to include any of [the doctor's] 'B criteria' opinions in his RFC assessment").  The ALJ properly performed the more detailed evaluation, considering and weighing the reports of the treating and evaluating professionals, as well as Roman's own testimony, and concluded that Roman had the RFC to perform to light, unskilled work, limited by certain environmental factors.  (Tr. 18).  His prior determinations have no bearing on this finding.

2.    Ability to Perform Past Work

Roman also argues that the ALJ improperly compared her RFC with the DOT description of her past work.  (Pl.'s Mem. at 17-18).  Specifically, Roman notes that the DOT description of "Sales Representative" states that the position "requires

31

'significant' compiling of data and persuading other people, dealing with other people, and influencing others."  (Id. at 18 (citing DOT #291.357-010, 1991 WL 672558)).

Although the ALJ stated that he found that Roman could perform her past work "as generally performed," (Tr. 24), the inquiry at Step Four involves assessing both the claimant's past relevant work as generally performed and the claimant's past specific job.  Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003) ("[T]he claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally.").  The claimant continues to carry the burden at this stage of the sequential process.  Id. at 185.

The ALJ specifically found that Roman could perform her past work "as generally performed," noting that her description of her job was "similar" to the DOT listing for "Solicitor or Canvasser."  (Tr. 24).  The ALJ noted that this job "is light and unskilled and requires no climbing or exposure to fumes, dust, gases, odors, or other pulmonary irritants."  (Id.).  However, he failed to note that the DOT description also states that the job requires "significant" compiling of data, as well as Level 2 math abilities, including the abilities to "[a]dd, subtract, multiply, and divide all units of measure."  (DOT #291.357-010).  Dr. Meadow, the consultative psychiatrist, found that Roman had "limited intellect" and could not perform such sophisticated mathematical operations.  (Tr. 209-10).  There is no evidence to the contrary.  Therefore, Roman is correct that a determination that she could perform all of the duties of the job described

by the DOT is not supported by substantial evidence.  Therefore, to the extent that the

ALJ stated that Roman could perform this work "as generally performed," (id. at 24), he

apparently erred.

    Nevertheless, there is no indication that Roman's <u>specific</u> prior work

included such a heavy emphasis on math or data.  Although the ALJ's decision did not

specifically discuss Roman's ability to perform her past specific job, this omission is not

reversible error.  A court need not remand when it is "able to look to other portions of the

ALJ's decision and to clearly credible evidence in finding that his determination was

supported by substantial evidence."  <u>Salmini</u>, 371 F. App'x at 112 (quoting <u>Berry</u>, 675

F.2d at 469).  In this case, Roman's testimony as to her job duties was simply that she

"stood on the street" and had people "fill out applications."  (Tr. 37).  Roman also

discussed this job with Dr. Cristina, reporting that she had "enjoy[ed] working and talking

to people."  (<u>Id.</u> at 263).  Roman's limited math abilities obviously did not keep her from

performing the work previously, and there is no evidence to suggest that it would keep

her from performing that same work going forward.  There also is no suggestion that any

of her other limitations would preclude such work.  Accordingly, the finding that Roman

could perform her past work was based on substantial evidence.  Furthermore, Roman has

not met her burden of showing that she could no longer perform her past specific work.

3.   Roman's Credibility

Roman further argues that the ALJ improperly assessed her credibility in making his RFC determination.  The ALJ found that her "allegations concerning the intensity, persistence, and limiting effects of her symptoms are not fully credible to the extent they are inconsistent with the [RFC] determination."  (Id. at 21).  Roman objects both to the ALJ's evaluation of her "overall lack of credibility" and to his determination that the objective medical evidence contradicts her testimony.  (Pl.'s Mem. at 15-16).

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 416.929; McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980)).  The ALJ is not required, however,  "to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  Id. (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).  To evaluate a claimant's allegations of subjective limitations, the ALJ must first "decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged" because "subjective assertions of pain alone cannot ground a finding of disability."  Id. (citing 20 C.F.R. § 404.1529(a)).  If the claimant does suffer from a medically determinable impairment, the ALJ must then consider "the extent to which [the claimant's] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence." 20 C.F.R.

§ 404.1529(c)(3).

Here, the ALJ first determined that Roman suffered from a medically

determinable impairment. (Tr. 21). He therefore properly continued on to consider her

purported symptoms. (See id. at 21-22). The ALJ determined that Dr. Cruz's notes and

Dr. Pelczar-Wissner's evaluation contradicted Roman's statements regarding the severity

of her asthma. (Id.). Although Roman alleged that her asthma prevented her from

working, (id. at 38), Drs. Cruz and Pelczar-Wissner both diagnosed the impairment as

"mild." (Id. at 232-34, 282, 297). The ALJ also noted that, at the time of Roman's SSA

application, she reported taking no medication for her asthma. (Id. at 22, 183). Similarly,

although Roman alleged that her depression prevented her from working, (id. at 38), the

generally positive evaluations by Calcano and Drs. Rodriguez and Meadow contradicted

those allegations. (Id. at 21-22). The ALJ also listed other reasons for doubting Roman's

credibility, including her changing descriptions of her work experience, and her testimony

regarding her home health aide. (Id. at 22-23).

The Commissioner, and not the reviewing court, must perform the function

of "resolv[ing] evidentiary conflicts and . . . apprais[ing] the credibility of the witnesses,

including the claimant." Aponte v. Sec'y, Dep't of Health and Human Servs., 728 F.2d

588, 591 (2d Cir. 1984). Here, the record supports the ALJ's finding that Roman's

asthma was mild and her depression not disabling. Therefore, the ALJ's determination

that Roman's allegations were not consistent with the evidence and his subsequent decision not to credit them are entitled to deference.  See 20 C.F.R. § 416.929(c)(3).

4.    <u>Alternative Finding</u>

Finally, even if the ALJ erred at Step Four, his error would be harmless and would not warrant remand.  The ALJ went on to Step Five, in the alternative, to consider whether Roman could perform other work in the national economy.  (Tr. 24).  Because his determination at that step was proper, a different outcome at Step Four would do nothing to change the overall result.  See <u>Zabala v. Astrue</u>, 595 F.3d 402, 410 (2d Cir. 2010) (ALJ's failure to consider doctor's report was harmless error because adverse determination would not have changed).

E.    <u>Fifth Step</u>

Roman objects to the ALJ's use of the Medical-Vocational Guidelines Rule 202.17 to draw the conclusion that Roman was capable of performing other work available in the national economy, arguing that due to her non-exertional limitations, reliance on the Guidelines was inappropriate and the ALJ should have sought out a vocational expert to determine what jobs in the national economy Roman could perform. (Pl.'s Mem. at 18-19).

Roman's argument assumes that she "certainly has significant non-exertional limitations" because "[t]he ALJ conceded [that] she is markedly limited in her concentration, persistence, or pace and moderately limited in her social functioning."

(Id. at 19).  As noted previously, however, findings at prior steps do not determine the scope of a claimant's RFC.  Indeed, the ALJ found that Roman's non-exertional limitations had "little or no effect on the occupational base of unskilled light work."  (Tr. 25).

In Bapp v. Bowen, 802 F.2d 601 (2d Cir. 1986), the Second Circuit held that use of the Guidelines to determine a claimant's disability status without consulting a vocational expert is not improper so long as the claimant's nonexertional impairments do not "significantly limit the range of work permitted by [the claimant's] exertional limitations."  Id. at 605 (quoting Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983) (per curiam)) (bracketed text added).  Thus, use of the Guidelines is appropriate as long as the nonexertional limitations do not "so narrow a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity."  Id. at 606.

The ALJ's determination that Roman's nonexertional limitations had "little or no effect" on her job opportunities is supported by substantial evidence in the record. Given the limited treatment that Roman received for her asthma, the ALJ found that this "mild impairment did not preclude her from undertaking light unskilled work so long as it involved no climbing or concentrated exposure to extreme heat or cold, wetness, humidity, fumes, gases, dust, or odors, or other pulmonary irritants."  (Tr. 18).  This finding obviously limited the range of jobs for which Roman might qualify.  The ALJ further found that Roman's mental impairments were not "significant enough to interfere

37

with [her] ability to function on a daily basis" and would not significantly affect the range of jobs she could perform.  (Id. at 23, 25).  Given these findings, the ALJ therefore could use the Guidelines in reaching his alternative finding that Roman was capable of performing other work available in the national economy without seeking out the testimony of a vocational expert.

V.      Conclusion

        For the foregoing reasons, the Commissioner's cross-motion for judgment on the pleadings, (ECF No. 13), should be granted, and Roman's motion, (ECF No. 11), should be denied.

VI.     Procedure for Filing Objections to this Report and Recommendation

        The parties are hereby directed that any objections to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen days from today, with copies sent to the chambers of the Honorable Paul G. Gardephe, United States District Judge, at the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York, 10007 and to the chambers of the undersigned, at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York, 10007.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of

time for filing objections must be directed to Judge Gardephe.  The failure to file timely

objections will result in a waiver of those objections for purposes of an appeal.  <u>See</u>

<u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wagner & Wagner, LLP v. Atkinson, Haskins,</u>

<u>Nellis, Brittingham, Gladd & Carwile, P.C.</u>, 596 F.3d 84, 92 (2d Cir. 2010).


        SO ORDERED.

Dated:      New York, New York
           February 13, 2014

                                    _____
                                      FRANK MAAS
                       United States Magistrate Judge