```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   9/30/16
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADDIA Y. ROMAN JIMENEZ,

                              Plaintiff,

              - against -

CAROLYN W. COLVIN,
Commissioner of Social Security,

                              Defendant.[1]

**ORDER**

12 Civ. 6001 (PGG) (FM)

PAUL G. GARDEPHE, U.S.D.J.:

              Plaintiff Addia Y. Roman Jimenez filed this action on August 6, 2012 pursuant to

Section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a

final decision of the Commissioner of the Social Security Administration ("SSA") denying her

application for Supplemental Security Income ("SSI"). (Cmplt. (Dkt. No. 1))  In an August 16,

2012 order, this Court referred this matter to Magistrate Judge Frank Maas for a Report and

Recommendation ("R&R").  (Dkt. No. 3)  The parties then filed cross-motions for judgment on

the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Dkt. Nos. 11, 13).

              On February 13, 2014, Magistrate Judge Maas issued an R&R recommending that

the Court grant the Commissioner's motion for judgment on the pleadings and deny Plaintiff's

motion.  See Roman Jimenez v. Colvin, No. 12 Civ. 6001 (PGG) (FM), 2014 WL 572721

(S.D.N.Y. Feb. 13, 2014).  Judge Maas concluded that the Administrative Law Judge ("ALJ")

had applied the correct legal standards in evaluating Plaintiff's claims, and that substantial

---

[1] Plaintiff's complaint named Michael J. Astrue, as the Commissioner of Social Security, as the
defendant.  On February 14, 2013, Carolyn W. Colvin took office as Acting Social Security
Commissioner.  She has therefore been substituted as the named defendant in this matter
pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. See 42 U.S.C. § 405(g).

evidence supported the ALJ's determination.  (Id.)  Plaintiff filed objections to the R&R on

February 28, 2014.  (Dkt. No. 18)

        For the reasons stated below, the Court will adopt the R&R, grant the

Commissioner's motion, and deny Plaintiff's motion.

**BACKGROUND**

        The relevant facts and procedural history of this action are set forth in detail in

Magistrate Judge Maas's R&R.  See Roman Jimenez, 2014 WL 572721, at *1-9.  Familiarity

with the R&R is assumed.

**I.      APPLICATION FOR SUPPLEMENTAL SECURITY INCOME**

        Plaintiff was born in the Dominican Republic on November 19, 1975, and moved

to the United States in the early 1990s.  (Tr. 36, 151-52)[2]  The last significant job that she held

was in approximately 1998, when she worked as a sidewalk solicitor.[3]  (Id. at 36-37, 186)  She

has also worked for brief periods packaging perfume, cleaning motels, and serving as a "book

cover person" at a book factory.  (Id. at 38, 48, 186)

        Plaintiff suffers from asthma and depression, which she claims have prevented her

from being able to work since September 1, 2008.  (Tr. 38-41, 178)  On September 19, 2008,

Plaintiff applied for Supplemental Security Income ("SSI").  (See id. at 14, 151-58)  Plaintiff's

application for benefits was denied on December 11, 2008.  (Id. at 65)

---

[2]  "Tr." refers to the certified transcript of the administrative record, which was filed in
connection with the Commissioner's answer.  (Dkt. No. 7)
[3]  Although Plaintiff represented herself as a telemarketer in the Disability Reports she submitted
to the Social Security Administration ("SSA"), she testified at her hearing that she was never a
telemarketer, but instead solicited people on the sidewalk to fill out phone service applications
for AT&T.  (Tr. 37, 186)  The ALJ made a finding that Plaintiff had last worked as a "sidewalk
solicitor."  (Tr. 18)

## II.     THE ALJ'S DECISION

On December 26, 2008, Plaintiff requested a hearing before an ALJ.  (Tr. at 14)

On March 12, 2010, a hearing was held before ALJ Cameron Elliot (Id.), at which Plaintiff was

represented by counsel.  (Id. at 33)  On April 21, 2010, ALJ Elliot issued a decision finding that

Plaintiff had not been under a disability since September 19, 2008 – the date the application was

filed – and therefore was not eligible for supplemental security income.  (Id. at 25)

In reaching this conclusion, the ALJ applied the five-step analysis under 20

C.F.R. § 404.1520(a)(4).[4]  (Id. at 16)  The ALJ determined that (1) Plaintiff had not engaged in

---

[4]  The regulations provide for the following analysis:

(i) At the first step, we consider your work activity, if any.  If you are doing
substantial gainful activity, we will find that you are not disabled.  (See paragraph
(b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s).  If
you do not have a severe medically determinable physical or mental impairment
that meets the duration requirement in § 404.1509, or a combination of
impairments that is severe and meets the duration requirement, we will find that
you are not disabled.  (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your
impairment(s).  If you have an impairment(s) that meets or equals one of our
listings in appendix 1 of this subpart and meets the duration requirement, we will
find that you are disabled.  (See paragraph (d) of this section.)

(iv) At the fourth step, we consider our assessment of your residual functional
capacity and your past relevant work.  If you can still do your past relevant work,
we will find that you are not disabled.  See paragraphs (f) and (h) of this section
and § 404.1560(b).

(v) At the fifth and last step, we consider our assessment of your residual
functional capacity and your age, education, and work experience to see if you
can make an adjustment to other work.  If you can make an adjustment to other
work, we will find that you are not disabled.  If you cannot make an adjustment to
other work, we will find that you are disabled.  See paragraphs (g) and (h) of this
section and § 404.1560(c).

3

substantial gainful activity since September 19, 2008; (2) Plaintiff has severe impairments that

include asthma, major depressive disorder, panic disorder, borderline personality disorder, and

cognitive disorder; (3) Plaintiff does not have an impairment or combination of impairments that

meets or equals the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff

has the residual functional capacity to perform light work,[5] "except she is limited to unskilled

work involving no climbing and no concentrated exposure to extreme cold, extreme heat,

wetness, humidity, or fumes, gases, dust, odors, and other pulmonary irritants," and therefore is

capable of performing her past work as a sidewalk solicitor; and (5) there are also other jobs that

exist in significant numbers in the national economy that Plaintiff can perform.  (Id. at 16-25)

---

20 C.F.R. § 404.1520(a)(4).

[5]  Under the applicable Social Security Administration regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10 pounds.  Even though the weight
> lifted may be very little, a job is in this category when it requires a good deal of
> walking or standing, or when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To be considered capable of
> performing a full or wide range of light work, [the claimant] must have the ability
> to do substantially all of these activities.  If someone can do light work, [the
> Commissioner] determine[s] that he or she can also do sedentary work, unless
> there are additional limiting factors such as loss of fine dexterity or inability to sit
> for long periods of time.

20 C.F.R. § 416.967(b).  The regulations further provide that

> [s]edentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which involves sitting, a certain
> amount of walking and standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

Id. § 416.967(a).

## A.   ALJ Evaluation at Step 3:  Comparison to Listed Impairments

As described above, the ALJ concluded at step 3 that neither Plaintiff's asthma nor her mental conditions meet or are medically equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 16)

As to Plaintiff's asthma, the ALJ determined that Plaintiff does not have "sufficiently severe obstructive pulmonary disease, or a history of asthma attacks, as required by [the] listing [for asthma]," noting that Plaintiff has never been hospitalized or gone to a hospital emergency room for her condition.  (Id.)

With respect to Plaintiff's depression, the ALJ found that it "only mildly to moderately limit[s] her ability to function."  (Id.)  The ALJ determined that Plaintiff had experienced "one to two episodes of decompensation, each of extended duration," and had "been hospitalized once for a suicide attempt in 2007, but suicidal ideation is not current."  (Id. at 17) The ALJ found that this did not demonstrate an impairment that meets or medically equals one of the listed impairments for schizophrenic, paranoid and other psychotic disorders, affective disorders, anxiety-related disorders, or personality disorders.  (Id. at 16)  The ALJ noted that Plaintiff's

> mental impairments [have] not cause[d] at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, . . . [and] [Plaintiff] does not have a history of repeated decompensations, would not be expected to decompensate with a minimal increase in mental demands or change in environment, does not live in and does not need to live in a highly structured environment, and can function outside her own home.

(Id. at 17)

5

## B.     ALJ Evaluation at Step 4:  Residual Functional Capacity

At step 4, the ALJ evaluated Plaintiff's residual functional capacity.  An

individual's "residual functional capacity is the most [she] can still do despite [her] limitations."

20 C.F.R. § 416.945(a)(1).  To make this evaluation, the ALJ considered (1) "whether there is an

underlying medically determinable physical or mental impairment – i.e., an impairment that can

be shown by medically acceptable clinical and laboratory diagnostic techniques – that could

reasonably be expected to produce [Plaintiff's] pain or other symptoms," and (2) "the intensity,

persistence, and limiting effects of the [Plaintiff's] symptoms to determine the extent to which

they limit the [Plaintiff's] functioning." (Tr. 18)

With respect to Plaintiff's asthma, the ALJ considered medical records from

examinations performed by Dr. Alcedo A. Cruz and Dr. Catherine Pelczar-Wissner.  (Id. at 20,

23)  Dr. Cruz examined Plaintiff on March 18, 2008 and October 14, 2008.  (Id. at 20)  The ALJ

found that Plaintiff's "physical examinations in August 2008, December 2008, and August 2009

were entirely normal, except that mild asthmatic wheezing was noted at the consultative

examination."  (Id. at 23)  The ALJ further found that although Plaintiff testified that "she uses

her nebulizer every six hours for five to six minutes, per her doctor's instructions, . . . no such

instructions appear in Dr. Cruz'[s] records, nor is her 'mild' asthma consistent with such

demanding use."  (Id.)  The ALJ afforded "controlling weight" to Dr. Cruz's opinion that

Plaintiff "should live in a first floor apartment or have access to an elevator."  (Id.)

The ALJ gave "little weight," however, to Dr. Cruz's statement in the "Medical

Request for Home Care" that Plaintiff needs a "home health aide to help with cleaning, laundry,

and cooking."  (Id.)  The ALJ noted that this assertion contradicts Plaintiff's "admission that she

is independent in her activities of daily living."  (Id.)  The ALJ further noted that Dr. Cruz "cites

6

asthma as a justification for the home health aide" but also reports that Plaintiff "shows no signs of respiratory impairment." (Id.) Finally, the ALJ credited and adopted Dr. Pelczar-Wissner's opinion that Plaintiff should avoid respiratory irritants, a finding that is consistent with that of the State's consulting physician. (Id. at 20, 24)

With regard to Plaintiff's depression, the ALJ noted that Plaintiff's medical records show that she has been hospitalized twice for depression – first at Bronx Lebanon Hospital in August 2007, and then at Jacobi Medical Center in December 2008. (Id. at 19, 241-53, 334-38) As to Plaintiff's mental condition, the ALJ considered opinions from Dr. Francisco Rodriguez, a psychiatrist; Gilbert Calcano, a licensed clinical social worker at the Oasis Guidance Center; and Dr. Herb Meadow, a psychiatrist who examined Plaintiff in a consultative capacity for the SSA. (Id. at 18-22)

On August 14, 2007, Plaintiff was admitted to Bronx Lebanon Hospital. Plaintiff had grabbed a knife and "scratched her left arm and then the family called EMS and she was brought to [the] emergency room." (Id. at 242, 249) Plaintiff was diagnosed as suffering from depression and suicidal ideation. (Id. at 248) Two days later, when Plaintiff was discharged, she

> was calm and cooperative. There were no abnormal movements. Her speech was spontaneous with normal rate and rhythm. Mood was better. Affect was still mildly constricted. She denied any suicidal or homicidal ideation or plan. She was coherent. There were no ideas of reference at this moment. She was alert and oriented x3. Her impulse control appeared to be fair.

(Id. at 242-43)

On September 4, 2007, Dr. Rodriguez conducted an initial psychiatric evaluation of Plaintiff. (Id. at 255) He described her attitude as "cooperative," but her mood as "depressed." (Id. at 256) Plaintiff denied any current suicidal or homicidal thoughts during this initial evaluation. (Id. at 257) Dr. Rodriguez wrote that the patient "has no disabilities." (Id. at

7

268)  At this initial evaluation, Dr. Rodriguez diagnosed Plaintiff as having a major depressive disorder, recurrent, severe with psychotic features, rule-out panic disorder, and borderline personality disorder and prescribed Citalopram, Ambien, and Risperdal.  (Id. at 258, 269)

Between September 2007 and December 2009, Dr. Rodriguez met with Plaintiff approximately once a month.  (Id. at 40)  On July 8, 2008, Dr. Rodriguez completed a "Medical Request for Home Care" form concerning Plaintiff.  (Id. at 289)  On the form, Dr. Rodriguez indicated that Plaintiff "becomes depressed [and] anxious with insomnia and [demonstrates] occasional low concentration [and] memory problems when . . . under stress, yet respond[s] to medication and psychotherapy."  (Id. at 290)  Dr. Rodriguez stated on the form that he was treating Plaintiff with Citalopram, an antidepressant, Ambien, a sleeping medication, and Risperdal.  (Id. at 289)  He also noted on the form that Plaintiff could ambulate inside and outside and get up from a seated position and from bed.  (Id. at 291)  Dr. Rodriguez saw Plaintiff on July 31, 2008, and wrote that Plaintiff stated "I'm feeling much better now."  (Id. at 273)  Dr. Rodriguez's notes indicate that Plaintiff was "feeling . . . optimistic."  (Id.)

On December 2, 2008, Dr. Herb Meadow, a consultative psychiatrist, evaluated Plaintiff.  (Id. at 208-11)  Dr. Meadow noted that Plaintiff's "eating and sleeping patterns are normal.  Her weight has been stable.  She states that she was depressed in the past, but that the medicine has helped alleviate the depression; although, she still occasionally has dysphoric moods with irritability and low energy and at times difficulty concentrating."  (Id. at 208)  Dr. Meadow also noted that Plaintiff displayed "[f]luent and clear" speech; she was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia;" her affect was "[a]ppropriate in speech and thought content;" and her memory skills – both recent and remote – were "intact."  (Id. at 209)  Dr. Meadow determined that Plaintiff's attention and concentration

8

were impaired due to limited intellect and not because of any psychiatric impairment. (Id. at 209) Dr. Meadow acknowledged that Plaintiff "had suicidal thoughts in the past," but noted that she did not have such thoughts "at this time." (Id. at 208) Dr. Meadow also remarked that "[a]t home, [Plaintiff] takes care of her personal hygiene, does all the household chores, and socializes with friends and family. She spends her days at home, watching TV, and taking care of her children." (Id. at 210) Dr. Meadow concluded that "[t]he results of the exam appear to be consistent with psychiatric and cognitive problems, but in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (Id.)

Between December 8, 2008 and the end of 2009, Plaintiff periodically met with Gilbert Calcano, a licensed social worker at the Oasis Guidance Center. (Id. at 372-475) On December 8, 2008, Mr. Calcano noted that Plaintiff "display[ed] depressive features" and was "tearful." (Id. at 475) On December 9 and 10, 2008, Plaintiff was treated at the emergency room of Jacobi Medical Center for an apparent overdose of Ambien. (Id. at 334) Plaintiff stated that she missed her daughter who had been removed from her household by the Administration of Children Services ("ACS"). (Id.) The Jacobi staff noted that Plaintiff improved after talking about the "situation" with her children. (Id.) At a December 13, 2008 session with Calcano, Plaintiff denied that her overdose of Ambien was a suicide attempt: she told Calcano "that she was tired and could not sleep . . . [and] denied [that] it was an act of attempted suicide." (Id. at 474) Four days later Calcano met with Plaintiff again. (Id. at 471) His notes state that Plaintiff "appears to be doing better and states that she is." (Id.) Calcano also wrote: "[Plaintiff] came in as scheduled, well oriented times three spheres, insight and judgment fair. Thought processes clear. Affect slightly depressed. Denies any suicidal ideation. No hallucinations or delusion evident. Short term and long term memory good." (Id.) Calcano's progress reports indicate

9

continued improvement in Plaintiff throughout 2009. (Id. at 470 ("feeling much better"), 462 ("appears less depressed"), 455 ("overall [Plaintiff] is progressing well and reporting less depressive symptoms"), 444 ("reporting a significant decrease in her depressive features"), 434 ("less depressed"))

On October 27, 2009, Dr. Rodriguez completed a "Psychiatric/Psychological Impairment Questionnaire" ("Questionnaire") at the request of Plaintiff's counsel. (Id. at 340-47) In the Questionnaire, Dr. Rodriguez diagnosed Plaintiff as suffering from major depressive disorder, borderline personality disorder, asthma, and psychosocial and environmental problems. (Id. at 340) He identified Plaintiff's more serious symptoms as frequent depressive features and severe suicidal ideation. (Id. at 342) He indicated that Plaintiff was "markedly limited" in her ability to "remember locations and work-like procedures," "understand and remember one or two step instructions," "understand and remember detailed instructions," and "work in coordination with or proximity to others without being distracted by them." (Id. at 343) He noted that Plaintiff experienced "episodes of deterioration or decompensation in work or work like settings which cause[d her] to withdraw from that situation and/or experience exacerbation of signs [or] symptoms." (Id. at 345) He further indicated that he expected Plaintiff's impairments to last at least twelve months, and that they would cause her to be absent from work more than three times each month. (Id. at 346-47)

Dr. Rodriguez met with Plaintiff on the day he completed the Questionnaire. (Id. at 428) His progress notes from that appointment state that the "issues related to [Plaintiff's] children seem to be getting better which make[s] her feel better, more motivated." (Id.) He also noted improvement in Plaintiff's sleep and appetite. (Id.) He described Plaintiff as "[c]alm,

10

pleasant[,] cooperative[,] . . . [c]oherent and goal directed." (Id.) He stated that Plaintiff denied homicidal and hallucinatory ideas and presented "[n]o evidence of psychosis." (Id.)

The ALJ gave "little weight" to Dr. Rodriguez's Questionnaire responses because they were "neither consistent with nor supported by his own treatment records," and were inconsistent with (1) Plaintiff's "own statements to Dr. Rodriguez and Mr. Calcano"; (2) their observations of her behavior; (3) the progress reports; and (4) the consultative mental status examination. (Id. at 22)

Calcano met with Plaintiff on November 2, 2009, and wrote that "[i]t is evident that [Plaintiff's] depression has lifted significantly, she smiled [throughout] the session and expressed lifted spirits." (Id. at 426) Three weeks later, Calcano wrote that Plaintiff "reports a significant decrease in her depression and depressive features. . . . [Plaintiff's] appearance has improved, [and] she doesn't have the flat affect that she had some time ago. She appears more energetic and content as opposed to depressed." (Id. at 424) By December 2009, Calcano noted that Plaintiff displayed "pride and joy" at joining a GED program, that "things at home [were] going fine," and that she "interacted well" and "demonstrated good socialization[] skills" at the Oasis Guidance Center holiday party. (Id. at 417, 420)

On December 29, 2009, at his final appointment with Plaintiff, Dr. Rodriguez observed that Plaintiff's "sleeping and appetite [were] good." (Id. at 418) She was "[c]alm, pleasant[,] and cooperative" and exhibited "[n]o psychosis." (Id.) Plaintiff again denied homicidal, suicidal, and hallucinatory ideation. (Id.)

After reviewing all of the above-mentioned medical records from the health care providers who treated Plaintiff's asthma and depression between 2007 and 2009, the ALJ determined that Plaintiff "has medically determinable impairments which limit her exertionally,

environmentally, and mentally. However, the record as a whole supports a conclusion that she is able to perform a wide range of unskilled work with light exertional demands." (Id. at 21) The ALJ noted that "[o]verall, the reports from Mr. Calcano and Dr. Rodriguez suggest that [Plaintiff] made steady progress concerning her mental health." (Id. at 22) Based on these findings, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a sidewalk solicitor for a telephone company, which did not require that she engage in any activities precluded by her Residual Functional Capacity ("RFC"). (Id. at 24)

Although the finding that Plaintiff had the RFC to perform her past relevant work was sufficient to end the inquiry, the ALJ went on to consider, at step 5, whether Plaintiff also could perform other jobs existing in significant numbers in the national economy. (Id.) Taking into account her RFC, as well as her "age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2," the ALJ determined that she could work as an "[a]ssembler, electrical accessories," a "[r]outing clerk," or a "[s]ilver wrapper." (Id. at 24-25) The ALJ therefore concluded that Plaintiff's limitations did "not reduce the number of light and sedentary occupations available to [her] to any significant degree," rendering her not disabled under the Act. (Id. at 25)

On June 5, 2012, the Social Security Administration Appeals Council denied Plaintiff's request for review, making the ALJ's determination the Commissioner's final decision. (Id. at 2)

## III.    THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Judge Maas carefully reviewed the non-medical evidence and all of the medical evidence concerning Plaintiff's conditions, much of which is summarized above. Jimenez v. Colvin, No. 12 Civ. 6001(PGG)(FM), 2014 WL 572721, at *1-6 (S.D.N.Y. Feb. 13, 2014). He

12

also reviewed the ALJ's determinations and findings at each step of the five-step sequential analysis. Jimenez, 2014 WL 572721, at *7-9. Judge Maas then considered Plaintiff's objections to the ALJ's findings.

Plaintiff claimed that the ALJ had improperly given "little weight" to the opinions of Dr. Rodriguez, the treating psychiatrist. (Id. at *10). Judge Maas noted, however, that had given a number of Dr. Rodriguez's opinions "controlling weight," and had rejected only those that were contradicted by contemporaneous records prepared by Dr. Rodriguez and social worker Calcano. (Id.)

Plaintiff also objected to the ALJ's assessment of Plaintiff's RFC. (Id. at *12) Judge Maas reviewed the ALJ's findings at each step in the five-step analytical process and found no errors or inconsistencies in the ALJ's findings and conclusions, except as to the ALJ's conclusion that Plaintiff could perform the work of a door to door sales representative. (Id. at *12-15) Judge Maas found that this finding was not supported by substantial evidence, because the Dictionary of Occupational Titles states that the position of "Sales Representative" "requires significant compiling of data," and the evidence in the record indicates that Plaintiff has a "'limited intellect' and could not perform . . . sophisticated mathematical operations." (Id. at *15) Judge Maas went on to conclude that this error did not require a remand, because while the evidence did not demonstrate that Plaintiff could perform her past work as "generally performed," there was evidence that she could perform her "specific prior work" as a street solicitor or canvasser:

> In this case, Roman's testimony as to her job duties was simply that she "stood on the street" and had people "fill out applications." (Tr. 37). Roman also discussed this job with Dr. Cristina, reporting that she had "enjoy[ed] working and talking to people." (Id. at 263). Roman's limited math abilities obviously did not keep her from performing the work previously, and there is no evidence to suggest that it would keep her from performing that same work going forward. There also is no suggestion that any of her

13

other limitations would preclude such work. Accordingly, the finding that Roman could perform her past work was based on substantial evidence. Furthermore, Roman has not met her burden of showing that she could no longer perform her past specific work.

(Id. at *15) (emphasis in original).

Plaintiff also argued that the ALJ had improperly assessed Plaintiff's credibility in making his RFC determination. Id. at *16. Judge Maas noted, however, that ALJs are not required "'to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (Id. (quoting Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)). Judge Maas noted that a number of Plaintiff's claims were contradicted by her doctors' opinions, as well as by Plaintiff's own statements about her medical condition. (Id.) Judge Maas concluded that the ALJ's credibility determinations provided no basis for disturbing his findings. (Id.)

Finally, Judge Maas rejected Plaintiff's argument that the ALJ had erred in concluding – in the absence of a vocational expert – that Plaintiff could perform other work that is available in the national economy. (Id. at *17) Judge Maas noted that the ALJ "found that [Plaintiff's] non-exertional limitations had 'little or no effect on the occupational base of unskilled light work,'" and that the ALJ's findings that Plaintiff's "nonexertional limitations had 'little or no effect' on her job opportunities is supported by substantial evidence in the record." (Id. (quoting Tr. 25))

Judge Maas recommends that Plaintiff's motion for judgment on the pleadings be denied, and that Commissioner's cross-motion for judgment on the pleadings be granted. (Id. at *18)

14

## DISCUSSION

## I.      STANDARD OF REVIEW

This Court "may accept, reject, or modify in whole or in part" findings or

recommendations issued by a magistrate judge. 28 U.S.C. § 636(b)(1). A district court must

review de novo "those portions of the report or specified proposed findings or recommendations

to which objection is made." Id. "To the extent, however, that the party makes only conclusory

or general arguments, or simply reiterates the original arguments, the Court will review the

Report strictly for clear error." Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., No. 07

Civ. 6865, 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008); see Ortiz v. Barkley, 558 F. Supp.

2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for

clear error where objections are 'merely perfunctory responses,' argued in an 'attempt to engage

the district court in a rehashing of the same arguments set forth in the original petition.'")

(citations omitted).

A court reviewing a final decision by the Commissioner "is limited to determining

whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507

(2d Cir. 2009); accord Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008). See generally 42

U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive. . . ."). Substantial evidence is "'more

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting

Richardson v. Perales, 402 U.S. 389, 401 (1971)). "The role of the reviewing court is therefore

quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson

v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citations omitted) (internal quotation marks omitted). If the court finds that there is substantial evidence to support the Commissioner's decision, that decision must be upheld, even if there also is substantial evidence for the plaintiff's position. See DeCherico v. Callahan, 134 F.3d 1177, 1182 (2d Cir. 1998).

## II.    ANALYSIS

Plaintiff objects to Judge Maas's R&R to the extent that it concludes that "(1) the ALJ properly applied the treating physician rule and supported the RFC finding with substantial evidence; (2) the ALJ appropriately evaluated Plaintiff's credibility; and (3) the ALJ did not err by finding Ms. Roman could return to her past relevant work, or alternatively, other work." (Pltf. Objections (Dkt. No. 18) at 1) Plaintiff asks this Court to overturn the ALJ's determination or, in the alternative, to remand for further fact-finding. (Id.)

### A.    Determination of Plaintiff's Mental Residual Functional Capacity

Plaintiff argues that the ALJ did not properly evaluate her RFC at step 4, and that the Magistrate Judge erred in concluding that the ALJ's finding was supported by substantial evidence. (See id. at 1-8) In particular, Plaintiff contends that (1) the ALJ did not properly weigh the opinions of Dr. Rodriguez – Plaintiff's treating physician – in evaluating her RFC, and (2) the ALJ improperly determined that Plaintiff can perform a full range of unskilled work. See id.

#### 1.    Weight Given to Dr. Rodriguez's Questionnaire

Plaintiff argues that the ALJ should have given the opinions of Dr. Rodriguez – Plaintiff's treating physician – "controlling weight," because they were "supported by appropriate psychiatric abnormalities that are grounded in the progress notes [in the record] and are uncontradicted by other substantial evidence." (Id. at 4) In particular, Plaintiff contends that

the ALJ should have given controlling weight to Dr. Rodriguez's "Psychiatric/Psychological
Impairment Questionnaire," (Id. at 1-3) in which Dr. Rodriguez indicated that Plaintiff has
"frequent[] depressive features" and "severe[] suicidal ideation."[6] (Tr. 342; see id. at 340-47)
Alternatively, Plaintiff argues that – even if Dr. Rodriguez's opinions are not entitled to
controlling weight – the ALJ gave his opinions less weight than they are entitled to. (Pltf.
Objections (Dkt. No. 18) at 5)

　　　　"[T]he . . . 'treating physician rule' . . . requires the ALJ to grant controlling
weight to the opinion of a claimant's treating physician if the opinion is well supported by
medical findings and is not inconsistent with other substantial evidence." Rosado v. Barnhart,
290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. § 416.927(d)(2)). If the treating
physician's opinion is inconsistent with "the opinions of other medical experts[,]" however, it is
not afforded controlling weight. Vargas v. Astrue, No. 10 CIV. 6306 PKC, 2011 WL 2946371,
at *10 (S.D.N.Y. July 20, 2011); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). "In
such a case, a report from a consultative physician may constitute substantial evidence." Vargas,
2011 WL 2946371, at *10 (citing Mongeur v. Hecklerd, 722 F.2d 1033, 1039 (2d Cir. 1983);
Carrington v. Barnhart, No. 04 Civ. 5187 (JGK), 2005 WL 2738940, at *9 n.2 (S.D.N.Y. Oct.
19, 2005)). Moreover, "the less consistent [the treating physician's] opinion is with the record as

---

[6] While Plaintiff implies that the ALJ rejected all of Dr. Rodriguez's opinions concerning
Plaintiff's RFC, that is not a fair reading of the record. The ALJ's negative comments
concerning Dr. Rodriguez – that his "opinion is not accorded controlling weight and is given
little weight overall" (Tr. 22) – were made after a lengthy discussion concerning the unreliability
of Dr. Rodriguez's statements in the Questionnaire. At other points, however, the ALJ relies on
Dr. Rodriguez's progress notes – which document a series of meetings with Plaintiff over several
years – in evaluating her RFC. (See id. at 23 (citing Dr. Rodriguez's progress notes, at Exhibit
7F)) Moreover, when discussing the weight to be given to the opinion evidence, the ALJ singles
out the Questionnaire: "Dr. Rodriguez's assessment (16F) [the Questionnaire] is given little
weight, as noted above." (Id.) Accordingly, the ALJ did not reject all of Dr. Rodriguez's
opinions. Instead, the ALJ rejected opinions expressed in the Questionnaire that were
contradicted by other evidence, including Dr. Rodriguez's own findings.

17

a whole, the less weight it will be given." Snell, 177 F.3d at 133. If the treating physician's opinion is not given controlling weight, the ALJ must set forth his reasons for the weight he assigns to the treating physician's opinion. Schall v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998); see also Vargas, 2011 WL 2946371, at *11 ("[W]hen the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so.").

Here, as noted above, the ALJ did not reject Dr. Rodriguez's opinions in a wholesale fashion. Indeed, the ALJ gave controlling weight to Dr. Rodriguez's opinions at step 3 in determining that Plaintiff has "a marked limitation in concentration, persistence, or pace." (Tr. at 17) At step 4, however, the ALJ gave "little weight" to Dr. Rodriguez's opinions as set forth in the October 27, 2009 Questionnaire, concluding that those opinions stood "[i]n sharp contrast to the generally rosy picture painted by the progress reports from Dr. Rodriguez and Mr. [Gilbert] Calcano[, a licensed social worker who had been providing Plaintiff with psychotherapy]." (Id. 22; see id. 21-22)

This Court agrees with Judge Maas's conclusion that the ALJ properly evaluated Plaintiff's physicians' opinions, including Dr. Rodriguez's opinions in the Questionnaire, in determining her RFC. As the ALJ explained, the opinions expressed in Dr. Rodriguez's Questionnaire are contradicted by other professionals' reports and "are neither consistent with nor supported by [Dr. Rodriguez's] own treatment records":

> For example, despite repeated denials of suicidal ideation, Dr. Rodriguez reported [in the Questionnaire] that the claimant has frequent depressive features and suicidal ideation (16F, p. 4). He reported that the claimant has a depressed mood, sleep disturbances, and interpersonal conflicts with others, symptoms which are flatly contradicted by the progress reports. Dr. Rodriguez further reported symptoms of poor memory, paranoia, hostility, and difficulty thinking (p. 3). These symptoms, too, are not consistent with or supported by the progress reports, and are strikingly inconsistent with the consultative mental status examination. Dr. Rodriguez assessed the claimant as markedly limited in her ability to remember locations and work-like procedures, to understand and remember even

18

one or two step instructions, and to work in coordination with or close proximity to others without being distracted by them (p. 5), an assessment contradicted by her own statements to Dr. Rodriguez and Mr. Calcano, and by her behavior as observed by those treating sources. Significantly, Dr. Rodriguez concluded that the claimant would be moderately limited but not totally precluded from performing mental activity on an ongoing basis in a competitive work environment (p. 4). Dr. Rodriguez's opinion that she would be likely to be absent from three or more days out of the month is utterly without foundation or
. explanation (p. 9). . . . Accordingly, Dr. Rodriguez'[s] opinion is not accorded controlling weight and is given little weight overall.

(Id. at 22)

The ALJ correctly observed that while Dr. Rodriguez reported that Plaintiff was suffering from ""frequent[] depressive features" and "severe[] suicidal ideation," and reported her prognosis as "poor" in the Questionnaire on October 27, 2009 (Id. at 340, 342), that same day, he stated in his progress notes that Plaintiff "[r]eported issues related to her children seem to be getting better which make[s] her feel better, more motivated. Sleeping and appetite appear improved. . . . Calm, pleasant and cooperative. Casually dressed and groomed. Coherent and goal directed. Denies [homicidal/suicidal/hallucinatory] ideas." (Id. at 428) As detailed in Judge Maas's R&R, statements in Dr. Rodriguez's Questionnaire are also contradicted by Dr. Meadow's findings and Mr. Calcano's treatment records.[7] Roman Jimenez, 2014 WL 572721, at *10-11; Tr. 22.

Plaintiff argues that Judge Maas's reliance on Dr. Meadow's findings is misguided, however, because (1) the ALJ "did not give any weight" to Dr. Meadow's opinions, and (2) Dr. Meadow was a one-time consultant. (See Pltf. Objections (Dkt. No. 18) at 3-4) Both arguments are meritless. The ALJ's statement that the Questionnaire is "strikingly inconsistent

---

[7] Plaintiff claims that "the ALJ failed to cite to any other medical opinions or other persuasive evidence in the record that contradicted the treating physician's findings." (Pltf. Objections (Dkt. No. 18) at 3) Given the ALJ's detailed explanation – quoted above – of the inconsistencies between Dr. Rodriguez's Questionnaire and (1) Dr. Rodriguez's notes; (2) Dr. Meadow's examination, and (3) Calcano's notes, this argument is meritless. (See Tr. 22)

19

with the consultative mental status examination" clearly refers to Dr. Meadow's evaluation, as

Dr. Meadow is the only physician cited in the analysis of step 4 who performed "a consultative

psychiatric evaluation" of Plaintiff. (See Tr. 20, 22) Moreover – contrary to Plaintiff's claim –

the ALJ expressly relied on Dr. Meadow's report in making his RFC determination. (See id. at

22-23 (citing Meadow's report, Exhibit 1F)) Furthermore, as noted above, "a report from a

consultative physician may constitute" "substantial evidence" where – as here – the treating

physician's opinions are inconsistent with those of other medical experts. Mongeur, 722 F.2d at

1039; see Vargas, 2011 WL 2946371, at *10. In contrast to Dr. Rodriguez's Questionnaire, Dr.

Meadow found that "[t]he results of [Plaintiff's] exam appear to be consistent with psychiatric

and cognitive problems, but in itself, this does not appear to be significant enough to interfere

with the claimant's ability to function on a daily basis." (Tr. 210 (emphasis added); see id. at 21)

Dr. Meadow also characterized Plaintiff's prognosis as "fair" and noted that "[a]t home, she

takes care of her personal hygiene, does all the household chores, and socializes with friends and

family. She spends her days at home, watching TV, and taking care of her children." (Id. at

210)

    Calcano's progress notes – which are cited by both the ALJ and Judge Maas –

further support the ALJ's RFC determination and conclusion that Dr. Rodriguez's Questionnaire

is inconsistent with other substantial evidence in the record. While not alone sufficient to

establish the nature of a medically determinable impairment, evidence from social workers may

be considered as part of the record as a whole "to show the severity of [one's] impairment(s) and

how it affects [one's] ability to work." 20 C.F.R. § 416.913(d). Here, Calcano's reports – which

cover the period from December 8, 2008 through December 3, 2009, consistently state that

Plaintiff denies having any suicidal thoughts. (Tr. 372-475) Indeed, on November 2, 2009 –

only six days after Dr. Rodriguez completed the Questionnaire – Calcano met with Plaintiff and reported that "[i]t is evident that [Plaintiff's] depression has lifted significantly, she smiled [throughout] the session and expressed lifted spirits." (Id. at 426)  On November 23, 2009, Calcano indicated that Plaintiff "reports a significant decrease in her depression and depressive features. . . . [Plaintiff's] appearance has improved, [and] she doesn't have the flat affect that she had some time ago.  She appears more energetic and content as opposed to depressed." (Id. at 424)

Plaintiff argues that "[e]ven if the opinions from Dr. Rodriguez are not controlling, the ALJ still failed to follow the appropriate legal standards and indicate what weight was given to the treating sources after a comprehensive discussion of the factors in 20 C.F.R. § 416.927(c)(2)-(6)."[8]  (Pltf. Objections (Dkt. No. 18) at 5)  The Regulations require the

_____

[8] The Regulations describe the process for weighing medical opinions as follows:

> (c) How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1) Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors

listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

> (ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

ALJ to "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [a] treating source's opinion."[9] 20 C.F.R. § 404.1527(c)(2). As described above, the ALJ did so here. (See Tr. 22) Moreover, contrary to Plaintiff's claims, the ALJ did not "ignore the[] factors" listed in 20 C.F.R. § 416.927(c). Instead, he expressly considered the factors set forth in this regulation. The ALJ addressed the nature of Dr. Rodriguez's relationship with Plaintiff as well as the reliability of his determinations. The ALJ (1) noted that Dr. Rodriguez was a treating source (Tr. 17; see id. at 22); (2) noted that Dr. Rodriguez has been treating Plaintiff's mental conditions since August 23, 2007 (id. at 19-20); (3) found that Dr. Rodriguez's opinion that Plaintiff would likely be absent from work three or more days each month was "utterly without foundation or explanation" (id. at 22); and (4) found that Dr. Rodriguez's opinions are inconsistent with other evidence in the record, including his own progress notes. (Id. at 22) In

---

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 416.927(c).
[9] Contrary to Plaintiff's claim, the Regulations do not require a "comprehensive discussion" of every factor; all that is required is that "the ALJ . . . 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004)); see Marquez v. Colvin, No. 12 Civ. 6819 PKC, 2013 WL 5568718, at *12 (S.D.N.Y. Oct. 9, 2013) (upholding ALJ's determination where, "[a]lthough the ALJ did not explicitly recite the factors [under 20 C.F.R. § 416.927(c)], his decision nonetheless adequately considered each factor in determining the weight to afford to the Questionnaire").

23

sum, the ALJ explained why Dr. Rodriguez's opinion in the Questionnaire would be "given little weight overall," and gave "good reasons" for that determination.

This Court finds that Judge Maas properly concluded that the ALJ's "determination that Rodriguez's Questionnaire should be afforded little weight was supported by substantial evidence." Roman Jimenez, 2014 WL 572721, at *11.

## 2.   **Substantial Evidence Supports the ALJ's RFC Determination**

Plaintiff argues that Judge Maas erred in concluding that substantial evidence supports the ALJ's determination regarding Plaintiff's RFC. (Pltf. Objections (Dkt. No. 18) at 5-8) Plaintiff claims that, "in discussing [her] RFC, the ALJ did not cite to any medical opinions or other substantial evidence that shows she can perform a full range of unskilled work." (Id. at 5) As Judge Maas correctly observes in the R&R, Plaintiff's claim that "'the ALJ did not cite to any medical opinions or other substantial evidence that shows she can perform a full range of unskilled work' . . . is simply incorrect." Jimenez, 2014 WL 572721, at *13.

The ALJ found that Plaintiff has "'residual functional capacity to perform light work . . . except she is limited to unskilled work involving no climbing and no concentrated exposure to extreme cold, extreme heat, wetness, humidity, or fumes, gases, dust, odors, and other pulmonary irritants.'" Id. (quoting Tr. 18) (emphasis in original). As Judge Maas notes in the R&R, the ALJ's conclusion that Plaintiff is able to perform unskilled work – subject to these limitations – is amply supported by the reports of Dr. Meadow, Dr. Cruz, and Dr. Pelczar-Wissner, as well as progress notes from Dr. Rodriguez and Mr. Calcano that demonstrate "continual improvement with treatment throughout their time with [Plaintiff]." See id. at *13-14. Contrary to Plaintiff's claim, the ALJ did not simply "pick and choose" evidence that supported his finding. (Pltf. Objections (Dkt. No. 18) at 6) Rather – as the R&R's discussion of the

24

evidence makes clear – the ALJ considered the totality of the record, carefully weighed the evidence, and thoroughly explained the basis for his RFC determination. See Jimenez, 2014 WL 572721, at *13-14; Tr. 21-24. The Court finds no error in the Magistrate Judge's conclusion that the ALJ's determination as to RFC is supported by substantial evidence.

Plaintiff claims that the Magistrate Judge erred in finding that Dr. Meadow's report supports the ALJ's conclusion, because the ALJ "did not give any weight to th[is] consultant." (See Pltf. Objections (Dkt. No. 18) at 6) This argument is meritless, for the reasons stated above.

Plaintiff also asserts that the ALJ's finding at step 4 "that [Plaintiff] can mentally perform unskilled work . . . conflicts with his earlier finding [at step 3] that Plaintiff has marked limitations in concentration, persistence, or pace; moderate limitations in social functioning; and, one to two episodes of decompensation, each of extended duration." (Id. at 7) Plaintiff claims that the ALJ's finding that Plaintiff "is markedly limited in . . . concentration, persistence, or pace demonstrates that she cannot perform a full range of unskilled work."[10] (Id. at 7-8) This argument was raised before the Magistrate Judge, and was properly rejected. See Jimenez, 2014 WL 572721, at *14.

In McIntyre v. Colvin, 758 F.3d 146 (2d Cir. 2014), the Second Circuit addressed a similar argument. There, the plaintiff – who had been found capable of performing light, unskilled work – argued that

---

[10]  According to the SSA, "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Security Ruling (SSR) 85-15, Titles II & XVI: Capability to Do Other Work-The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments, 1985 WL 56857, at *4 (1985).

[t]he [ALJ's] residual functional capacity finding was not supported by substantial evidence because the finding at Step Four (that McIntyre has no diminution in social functioning and concentration, persistence, pace) [was] inconsistent with the findings at Step Two (that McIntyre's affective disorder is a "severe impairment") and Step Three (that McIntyre has moderate difficulties in those functions).

McIntyre, 758 F.3d at 150. The Second Circuit rejected this argument, noting that "[c]ontrary to [Plaintiff's] assertion, an ALJ's decision is not necessarily internally inconsistent when an impairment found to be severe is ultimately found not disabling: the standard for a finding of severity under Step Two of the sequential analysis is de minimis and is intended only to screen out the very weakest cases."[11] Id. at 151. The Court ultimately upheld the ALJ's determination, finding that "substantial evidence in the record demonstrates that McIntyre can engage in 'simple, routine, low stress tasks,' notwithstanding her physical limitations and her limitations in concentration, persistence, and pace." Id. at 152.

Here, the ALJ's determination that Plaintiff is able to perform light unskilled work – subject to certain limitations – is supported by substantial evidence. The ALJ's findings that "[t]he claimant is independent in her activities of daily living, including taking care of three children," and that plaintiff's psychiatric and cognitive problems "were not significant enough to interfere with her ability to function on a daily basis" (Tr. 23), support the ALJ's conclusion that Plaintiff "can engage in 'simple, routine, low stress tasks,' notwithstanding her physical limitations and her limitations in concentration, persistence, and pace." See McIntyre, 758 F.3d at 152.

---

[11] Cf. SSR 96-8P, Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *4 (1996) ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review Technique Form].").

26

### B.      Plaintiff's Credibility

Plaintiff argues that this Court should reject Judge Maas's conclusion that the ALJ properly weighed Plaintiff's credibility during the administrative hearing. (Pltf. Objections (Dkt. No. 18) at 9)  Plaintiff argues that (1) her testimony regarding her disabilities was not inconsistent with the reports of her treating and examining physicians, because the fact that Plaintiff's condition improved with treatment does not mean that she is not disabled, and (2) "minor inconsistencies" in her testimony regarding "her level of schooling and work history do not show an intent to mislead."  (Id.)

As noted above, "[w]hen determining a claimant's [RFC], the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  Genier, 606 F.3d at 49 (internal citations omitted).  "The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."  Id. (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record."  Id. (citing 20 C.F.R. § 404.1529(b)).

A claimant's "statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work . . . [will not be rejected] solely because the available objective medical evidence does not substantiate [her] statements."  20 C.F.R. § 416.929(c)(2).  The Commissioner, however, may

consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence, including [the claimant's] history, the signs and laboratory findings, and statements by [the claimant's] treating or nontreating source or other persons about how [the claimant's] symptoms affect [the claimant]. [The claimant's] symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities . . . to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

Id. § 416.929(c)(4).

Federal "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while testifying." Marquez v. Colvin, No. 12 Civ. 6819(PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013) (citing Yellow Freight Sys. Inc. v. Reich, 38 F.3d 76, 81 (2d Cir. 1994)).

Here, the ALJ made the following finding concerning Plaintiff's credibility:

after careful consideration of the evidence, the claimant's allegations concerning the intensity, persistence, and limiting effects of her symptoms are found not fully credible to the extent they are inconsistent with the above residual functional capacity assessment. This is principally because of the objective medical evidence regarding the claimant's mental condition, and the overall lack of credibility of the claimant's allegations, statements, and testimony.

(Tr. 21-22)

As Judge Maas and the ALJ note, Plaintiff's testimony about the extent of her disabilities and how they affect her ability to work is flatly contradicted by the records of her examining and treating sources. Dr. Cruz's notes and Dr. Pelczar-Wissner's evaluation contradict Plaintiff's statements regarding the severity of her asthma. (Id. at 20-23; Jimenez, 2014 WL 572721, at *16) While Plaintiff testified that her asthma prevents her from working (Tr. 38), both doctors diagnosed Plaintiff's impairment as "mild." (Id. at 232-34, 282, 297) Indeed, by the time Plaintiff filed her SSI application, she reported that she was not taking medication for her asthma. (Id. at 22-23, 182-83)

28

Similarly, Dr. Rodriguez's, Dr. Meadow's, and social worker Calcano's evaluations of Plaintiff – from 2008 through 2010 – reflect continued improvement and stability in her mental condition, and a decrease in her depression. (Id. at 20-22) These evaluations contradict Plaintiff's claim that her depression is so severe as to prevent her from working. (Id. at 39) The decision to reject Plaintiff's testimony was not based on "minor inconsistencies," as Plaintiff argues. Instead, Plaintiff's testimony was rejected because it directly and significantly contradicted her medical providers' reports. Plaintiff's changing descriptions of her work experience, her schooling, her asthma, and her need for a home health aide only further undermined her credibility. (Id. at 22-23) In sum, the ALJ properly concluded that Plaintiff's testimony could not "reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(c)(4).

## C.     The ALJ's Finding that Plaintiff Can Return To Her Past Work, or Alternatively, Engage in Other Work

Plaintiff objects to Judge Maas's recommendation that this Court find that Plaintiff can perform her past work (under step 4), or alternatively, engage in other work (under step 5). (Pltf. Objections (Dkt. No. 18) at 9-11)

### 1.     The ALJ's Step 4 Analysis

Plaintiff challenges the ALJ's conclusion that she can perform past relevant work, and Judge Maas's recommendation that this Court accept that determination.

The Second Circuit "ha[s] held that in the fourth stage of the SSI inquiry, the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally." Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis in original). "This inquiry requires separate evaluations of the previous specific job and the job as it is generally performed." Id.

29

At step 4 of the analysis, the ALJ concluded that Plaintiff was capable of

performing her past relevant work "as [it is] generally performed." (Tr. 24) Specifically, the

ALJ concluded that Plaintiff's description of her work as a sidewalk solicitor "makes it similar to

the job of Solicitor or Canvasser, also known as Sales Representative, Door-to-Door (DOT

#291.357-010)." (Id.) The ALJ therefore concluded that Plaintiff was not under a disability.

(Id. at 25)

As noted above, Judge Maas agreed with the ALJ's conclusion that Plaintiff was

capable of returning to her past work as a sidewalk solicitor, but rejected the ALJ's reasoning.

Judge Maas found that the ALJ

> failed to note that the [Dictionary of Occupational Titles ("DOT")] description . . .
> states that the job requires "significant" compiling of data, as well as Level 2
> math abilities, including the abilities to "[a]dd, subtract, multiply, and divide all
> units of measure." (DOT # 291.357–010). Dr. Meadow, the consultative
> psychiatrist, found that Roman had "limited intellect" and could not perform such
> sophisticated mathematical operations. (Tr. 209-10). There is no evidence to the
> contrary. Therefore, Roman is correct that a determination that she could perform
> all of the duties of the job described by the DOT is not supported by substantial
> evidence. Therefore, to the extent that the ALJ stated that Roman could perform
> this work "as generally performed,'" (Tr. 24), he apparently erred.

Jimenez, 2014 WL 572721, at *15. This Court agrees with Judge Maas's finding on this point.

See Dictionary of Occupational Titles 291.357-010 (4th ed. 1991), available at 1991 WL 672558

(stating that a Door-to-Door Sales Representative requires "level 2" math skills, including the

ability to "[a]dd, subtract, multiply, and divide all units of measure[;] [p]erform the four

operations with like common and decimal fractions[;] [c]ompute ratio, rate, and percent[;] [d]raw

and interpret bar graphs[;] [p]erform arithmetic operations involving all American monetary

units."); (Tr. 209 ("Meadow's Report") ("She could count, but not add or subtract single digit

numbers[,] stating math was always a problem.")).

Judge Maas went on to conclude, however, that Plaintiff was capable of

performing her "specific" prior work. Jimenez, 2014 WL 572721, at *15 (emphasis in original).

Judge Maas found that other portions of the ALJ's decision and "clearly credible evidence" in

the record supported such a finding:

> Roman's testimony as to her job duties was simply that she "stood on the street"
> and had people "fill out applications." (Tr. 37). Roman also discussed this job
> with Dr. Cristina, reporting that she had "enjoy[ed] working and talking to
> people." (Id. at 263). Roman's limited math abilities obviously did not keep her
> from performing the work previously, and there is no evidence to suggest that it
> would keep her from performing that same work going forward. There also is no
> suggestion that any of her other limitations would preclude such work.
> Accordingly, the finding that Roman could perform her past work was based on
> substantial evidence. Furthermore, Roman has not met her burden of showing
> that she could no longer perform her past specific work.

Id.

Plaintiff contends that this Court must reject Judge Maas's recommendation, and

find that the ALJ's decision is not supported by substantial evidence, because "this Court cannot

make a determination not made by the ALJ to affirm the decision denying benefits." (Pltf.

Objections (Dkt. No. 18) at 10)

It is true that the Second Circuit has held that "[w]here there is a reasonable basis

for doubt [as to] whether the ALJ applied correct legal principles, application of the substantial

evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant

will be deprived of the right to have her disability determination made according to the correct

legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). Nevertheless, "where

application of the correct legal principles to the record could lead to only one conclusion, there is

no need to require agency reconsideration." Id.

Here, the "record . . . compel[s] one conclusion under the . . . substantial evidence

standard" – that Plaintiff could perform her specific prior work as a sidewalk solicitor. Id. The

record would not support by substantial evidence a contrary finding. See id.; Havas v. Bowen, 804 F.2d 783, 786 (2d Cir. 1986) ("We have reviewed the record and conclude that there is no substantial evidence to refute [the] conclusion that [Plaintiff] cannot return to his job.")

Plaintiff testified that her prior work entailed standing on the street and convincing passers-by to fill out applications for phone services. (Tr. 37) Plaintiff reported that, during her prior work, she "enjoy[ed] working and talking to people." (Id. at 263) There is no evidence in the record that Plaintiff's prior work involved sophisticated mathematical operations, which Dr. Meadow concluded Plaintiff could not perform. (Id. at 209) Additionally, substantial evidence would not support a finding that Plaintiff's specific prior work would expose her to "climbing [or to] concentrated exposure to extreme cold, extreme heat, wetness, humidity, or fumes, gases, dust, odors, and other pulmonary irritants," all of which the ALJ determined were beyond Plaintiff's RFC. (Id. at 18) While Plaintiff's past work required her to stand outside – where it is sometimes hot, cold, humid, or wet – it is clear from the record that Plaintiff's exertional limitations do not generally prevent her from being outside. Moreover, Plaintiff has provided no evidence – nor suggested in her papers – that her prior job required "concentrated exposure" to the elements. Plaintiff's testimony that she had to stand outside to perform her prior work – without more – does not constitute substantial evidence that her environmental limitations preclude such work.

Accordingly, after reviewing the record, this Court finds that there is only one conclusion supported by substantial evidence: that Plaintiff could perform past relevant work. See Pichardo v. Comm'r of Soc. Sec., No. 14 Civ. 7213(KPF), 2015 WL 6674822, at *11-12 (S.D.N.Y. Oct. 30, 2015).

## 2.    The ALJ's Step 5 Analysis

As Judge Maas noted, even if the ALJ erred at step 4, his alternative finding at

step 5 – that Plaintiff could perform other work in the national economy – is supported by

substantial evidence and is sufficient to uphold his determination that Plaintiff is not disabled.

See Zabala v. Astrue, 595 F.3d 402, 407 (2d Cir. 2010) ("Despite concluding that Petitioner was

not eligible for benefits at step four, the ALJ continued to step five, which places the burden on

the Commissioner to show that the claimant has the residual functional capacity to perform other

jobs.").

"Once a disability claimant proves that his severe impairment prevents him from

performing his past work, the Secretary then has the burden of proving that the claimant still

retains a residual functional capacity to perform alternative substantial gainful work which exists

in the national economy." Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). "In the ordinary

case the Secretary satisfies his burden by resorting to the applicable medical vocational

guidelines (the grids). . . . [However,] if a claimant suffers from additional 'nonexertional'

impairments, the grid rules may not be controlling." Id.

"If the guidelines adequately reflect a claimant's condition, then their use to

determine disability status is appropriate." Id. at 605. But "if a claimant's nonexertional

impairments 'significantly limit the range of work permitted by his exertional limitations' then

the grids obviously will not accurately determine disability status because they fail to take into

account claimant's nonexertional impairments." Id. (citing Blacknall v. Heckler, 721 F.2d 1179,

1181 (9th Cir. 1983)). A significant limitation of the range of work permitted by an individual's

exertional limitations "mean[s] the additional loss of work capacity beyond a negligible one or,

in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Id. at 606.

Plaintiff argues that the ALJ erred at step 5 by relying on the Medical-Vocational Guidelines, rather than calling a vocational expert to testify. (See Pltf. Objections (Dkt. No. 18) at 10-11) She argues that the ALJ incorrectly determined that her "non-exertional limitations had little or no effect on her occupational base." (Id. at 10) In support of this argument, Plaintiff contends that "[t]he ALJ conceded [that] she is markedly limited in her concentration, persistence, or pace and moderately limited in her social functioning," and that such limitations are "more than significant enough to preclude reliance on grids by the Commissioner at step five." (Id. (emphasis in original)) In such circumstances, the Commissioner is required to introduce the "testimony of a vocational expert." (Id.)

Plaintiff's claim is premised on the notion that her mental condition renders her incapable of performing unskilled work, and thus so "'narrows [her] possible range of work as to deprive [her] of a meaningful employment opportunity.'" (Id. at 11 quoting (Bapp, 802 F.2d at 606)) As discussed above, however, this Court concludes that substantial evidence supports the ALJ's determination that – despite Plaintiff's non-exertional limitations – she can perform unskilled work. In reaching this conclusion, the ALJ acknowledged that "[w]ith regard to concentration, persistence, or pace the [Plaintiff] has marked difficulties." (Id. at 17) Nonetheless, the ALJ concluded that Plaintiff's non-exertional "limitations have little or no effect on the occupational base of unskilled light work" that Plaintiff can perform. (Id. at 25) This conclusion is supported by Dr. Meadow's finding that Plaintiff's non-exertional limitations are not "significant enough to interfere with [her] ability to function on a daily basis" (Id. at

210), and by the fact that "[o]verall, the reports from Mr. Calcano and Dr. Rodriguez suggest that the claimant made steady progress concerning her mental health." (Id. at 22)

Accordingly, this Court finds that substantial evidence supports the ALJ's determination that – despite her non-exertional impairments – Plaintiff can still perform most if not all of the "approximately 1600 separate unskilled light and sedentary occupations. . . [,] [e]ach of [which] represents numerous jobs in the national economy." (Id. at 25)  Given this wide range of jobs that Plaintiff could perform despite her non-exertional impairments, these impairments do not "so narrow[] [Plaintiff's] possible range of work as to deprive [her] of a meaningful employment opportunity." Bapp, 802 F.2d at 606.  Accordingly, the ALJ properly utilized the Medical-Vocational Guidelines to determine at step 5 that the Plaintiff is not disabled.  See id. at 605 ("If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate.").

## CONCLUSION

For the reasons stated above, this Court adopts the findings and conclusions set forth in the Magistrate Judge's R&R.  Plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is denied, and the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 13) is granted.  The Clerk of the Court is directed to terminate the motions and to close this case.

Dated: New York, New York
        September 29, 2016

SO ORDERED.

Paul G. Gardephe
United States District Judge

35